**LEADER FEDERAL BANK FOR SAVINGS, Petitioner,**

v.

**Susan SAUNDERS; and All Other Occupants of 12021 North County Road 5–J, Wellington, Colorado 80549, Respondents.**

**No. 95SC752.**

Supreme Court of Colorado, En Banc.

Jan. 13, 1997.

Law Office of Michael P. Medved, P.C., Michael P. Medved, Lakewood, for Petitioner.

No appearance on behalf of Respondents.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari in *Leader Federal Bank for Savings v. Susan Saunders,* No. 95 CV 361 (Larimer County Dist. Ct. Nov. 9, 1995), to review the district court's determination that a mobile home retains its status as personal property when the title to the mobile home is not purged pursuant to the Titles to Manufactured Homes Act (Act), sections 38–29–101 to –143, 16A C.R.S. (1996 Supp.).[1] The district court reversed the county court's order granting possession of the mobile home to Leader Federal Bank for Savings (Leader), the petitioner, which holds a public trustee's deed for the land on which the mobile home is located.

We hold that the common law of fixtures and appurtenances as applied to mobile

---

1. We granted certiorari to decide:
   Whether the provisions of the Titles to Manufactured Homes Act, §§ 38–29–101 to –143, 16A C.R.S. (1995 Supp.), completely abrogate Colorado common law as to a determination of whether a mobile home is a fixture and/or an appurtenance to the real property subject to a deed of trust.

homes is abrogated by the Act. Consistent with our interpretation of the Act, however, we also conclude that Leader is entitled to foreclose on the mobile home at issue here. Accordingly, we affirm in part and reverse in part the district court's order. We remand the case to the district court for disposition consistent with our decision.

## I.

In August of 1985, Donald R. and Elizabeth A. Kelly purchased unimproved real property in Larimer County located at 12021 North County Road 5–J, Wellington, Colorado (the Property) on which they placed a 1981 Champion 12' × 60' mobile home[2] transported from Greeley, Colorado. The Kellys subsequently converted the mobile home into a "double-wide" home with measurements of 24' × 60'. The Kellys financed the purchase of the Property with a loan for $72,348 from Universal Lending Corporation (Universal). In connection with the loan, the Kellys executed a thirty-year note and deed of trust to Universal, thereby securing the loan with the Property. Universal was not expressly granted a separate security interest in the mobile home. Donald Kelly testified, however, that both he and Universal intended the deed of trust to include the mobile home.[3]

The Universal loan was contingent on the Kellys' ability to secure approval from the United States Department of Housing and Urban Development (HUD) to insure Universal's loan. If the Kellys could not obtain HUD approval within 90 days of signing the loan papers, Universal could declare the loan immediately due and payable. In order to obtain HUD approval for the particular loan sought, Kelly testified that the mobile home had to be classified as a residential home. The process of conversion from a mobile home or a manufactured home into residential real property is governed by the terms of the Act which is implemented on a local level by county assessors' offices. Since the mobile home was located in Larimer County, the conversion process was regulated by the Larimer County Assessor's Office.

Kelly testified that he took some of the prescribed steps to convert the mobile home into residential real property.[4] In particular, Kelly installed the mobile home on a foundation, removed its wheels, removed and sold the axles, and installed permanent electrical and water utility systems as well as a sewage disposal system. As part of the conversion process, Kelly had to obtain a certificate of occupancy which would confirm that he had made the required physical adjustments to convert the mobile home into residential real property.[5] Kelly testified that he obtained a certificate of occupancy prior to the closing date of the loan.[6] Obtaining a certificate of occupancy fulfills one of the requirements enumerated by the Larimer County Asses-

---

2. Although the Act refers to manufactured housing, both lower courts (the county court and district court) called the subject home a mobile home. We will do likewise. We note that the General Assembly amended the Act in 1989, replacing the term "mobile home" with "manufactured home" or "manufactured housing" throughout the Act. See Ch. 122, 1989 Colo. Sess. Laws 712. Act approved April 19, 1989.

3. According to Donald Kelly's testimony, if the Property were vacant, its worth was only $34,000. Therefore he would not have been able to obtain a loan for $72,348 by securing it with the land alone.

4. The Kellys bought the mobile home in 1980 and subsequently moved it to the Property at issue here. We note that the Act provides that a new manufactured home becomes real property when it is transported to a site and permanently affixed to the ground which obviates the need for a certificate of title. § 38–29–114(2), 16A C.R.S. (1996 Supp.). Because the Kellys purchased the mobile home before the Act became effective, this statutory provision does not apply in this case.

5. A certificate of occupancy is issued after an inspection by the appropriate building department is completed. See infra p. 16 (quoting the Larimer County Assessor's Office brochure on converting mobile homes into residential real property).

6. An employee of the Larimer County Assessor's Office, however, testified that no such certificate had ever been issued to Kelly. Despite this conflicting testimony, the county court found that such a certificate had been issued. Because title to the mobile home was never purged, the question of whether or not a certificate of occupancy was issued is irrelevant to our inquiry.

sor's Office in its brochure entitled "Converting A Mobile Home to Real Property." Pursuant to the Act, and as set forth in the brochure, however, the conversion process also entails purging the title to the mobile home.[7] *See* §§ 38–29–112(1.5), –118(2), 16A C.R.S. (1996 Supp.).

Although the mobile home had a Colorado certificate of title, Kelly did not purge the title. According to his testimony before the county court, Kelly lost or misplaced the certificate of title. Consequently, the mobile home was not technically converted from personal to real property pursuant to the purging provisions of the Act. And, as a further consequence, the mobile home was not removed from the personal property tax rolls and added to the real property tax rolls. The Kellys apparently managed to obtain HUD approval despite this deficiency. In fact, Universal continued to pay personal property taxes on the mobile home through the 1992 tax year.[8] Given the requirements of the HUD-approved loan, Universal's continued payment of personal property taxes on the mobile home, in conjunction with real property taxes on the Property, should have alerted Universal that something was seriously amiss.

In September 1991, Susan Saunders purchased the Property and the mobile home from the Kellys by warranty deed. There was no transfer of title to the mobile home to Saunders, however, and the title continued to be held in the Kellys' names.[9] Pursuant to their "Residential Contract to Buy and Sell Real Estate," the purchase price included "lighting, heating, plumbing, ventilation, and air conditioning fixtures, TV antennas, water softeners...." This language, describing its components and interior, clearly indicated that the mobile home was included in the sale. In connection with the sale, Saunders assumed the Kellys' loan, then held by Alliance Mortgage Company. The loan was subsequently assigned to Leader in 1993. Thereafter, Saunders defaulted on the loan and Leader foreclosed upon the deed of trust. On September 7, 1994, Leader was issued a public trustee's deed to the Property. Leader did not pay the personal taxes on the mobile home, apparently because it did not have the certificate of title for the home and was unaware that the structure was not a conventional home. As a result, Saunders was served a "Distraint Warrant"[10] on October 14, 1994, on the mobile home.[11] Saunders then paid the personal property taxes due on the mobile home, some $196.61.

On December 2, 1994, Leader filed a complaint in unlawful detainer pursuant to section 13–40–104, 6A C.R.S. (1987), against Saunders and all other occupants of 12021 North County Road 5–J, Wellington, Colorado. After holding a bench trial on January 6, 1995, the county court determined that the only issue before it was whether the mobile home was subject to foreclosure by Leader or if it remained Saunders's personal property.

The county court issued a "Findings and Order" on April 21, 1995. Noting that the question of whether the mobile home had become a fixture to the Property was a question of fact, the county court concluded that the mobile home was covered under Leader's deed of trust. *See Mining Equip. Inc. v. Leadville Corp.*, 856 P.2d 81, 85 (Colo.App.

---

**7.** Purging the title simply means that the original certificate of title is mailed by the county assessor's office to the Colorado Division of Motor Vehicles where the mobile home is removed from its records.

**8.** Pursuant to the loan agreement, the lender was to pay taxes out of a tax escrow account funded by the debtor.

**9.** Instead, the warranty deed provided only a legal description of the Property. In fact, Saunders testified that she was not able to refinance the loan in 1992 because the title to the mobile home was still held in the Kellys' names. This was when she first learned that the mobile home was titled as personal property.

**10.** A "Distraint Warrant" is issued to enforce collection of delinquent taxes on personal property. § 39–10–111(1)(a), 16B C.R.S. (1996 Supp.).

**11.** The Distraint Warrant was issued in the Kellys' names.

1993) ("The determination of whether an article of personal property attached to realty is a fixture or remains personal property is a question of fact."). In so concluding, the county court found insignificant that the certificate of title had not been purged. In particular, the county court was persuaded by Leader's argument that the Act controls only the tax status of the mobile home. Thus, the county court did not adjudge the purging process described in the Act to be the sole avenue of conversion. Instead, it relied upon the common law of fixtures and appurtenances.

The county court applied the three-pronged test fashioned by the Colorado Court of Appeals in *Ferganchick v. Johnson,* 28 Colo.App. 448, 450, 473 P.2d 990, 992 (1970), that an object becomes a fixture if: (1) it is annexed to the real property; (2) it is adapted to the use of the real property; and (3) it is intended that the object become a permanent accession to the real property. *See also Mining Equip. Inc.,* 856 P.2d at 85 (reiterating the test and citing *Ferganchick* ).

The county court weighed the evidence and concluded that the mobile home had become a fixture to the Property:

> The mobile home was sufficiently attached to the land to conclude that it was annexed. The method of attachment and installation compels this conclusion. The mobile home was adapted to the use of the property. It was a home placed upon a residential parcel for permanent use. The wheels were removed and the electricity, water and sewage disposal were permanently installed. The original owner of the mobile home, Mr. Kelly, intended that it be permanent. The original lender intended that it be permanent. It was not until the note became delinquent that the issue arose.

The county court then ruled that Leader was entitled to the mobile home pursuant to its public trustee's deed. *See Alamosa Nat'l Bank v. San Luis Valley Grain Growers, Inc.,* 756 P.2d 1022, 1027 (Colo.App.1988) ("A

real estate deed of trust attaches automatically to buildings and personal property which attaches to the land after execution of the deed of trust in such a way as to take on the character of real estate, *i.e.,* which become fixtures.").

Saunders appealed the county court's decision to the district court pursuant to Rule 411 of the County Court Rules of Civil Procedure. On appeal, the district court interpreted the Act and found that it did abrogate the common law of fixtures and appurtenances.[12] Citing *Shoemaker v. Mountain States Telephone and Telephone Company,* 38 Colo. App. 321, 559 P.2d 721 (1976), the district court observed that the legislature can abrogate common law by the passage of inconsistent legislation. Because it found that the Act was inconsistent with common law, the district court concluded that the mobile home had not been converted from personal to real property. In so holding, the district court was not persuaded by Leader's argument that the Act applies only for taxation purposes:

> While it is true that the Act is administered by the Executive Director of the Department of Revenue ... Section 112(1.5) implies that purging the title to a manufactured home pursuant to the provisions of this Act converts it into real property for all purposes, not just taxation. Articles 30 to 44 ... are in a section of Title 38 entitled "Real Property—Interests in Land." [Leader's] assertion that the Act is for mere taxation purposes ignores the statute's provision that Articles 30 to 44 are to apply to a manufactured home which has been converted into real property according to the Act. Moreover, the fact that the Act is found in the Property section of the Colorado statutes, as opposed to Title 39 which deals with taxation, indicates that the Act is not limited to taxation purposes.

*Leader Fed'l Bank for Savings,* No. 95 CV 361, slip op. at 2–3.

The district court remanded to the county court for disposition according to its ruling,

**12.** The district court did not review the county court's fact findings.

*i.e.*, for a judgment that Leader was not entitled to foreclose on the mobile home. Leader sought and obtained certiorari review of the district court's determination. Saunders did not appear in this court.

## II.

The question of whether the Act abrogates the common law of fixtures as applied to mobile homes is an issue of first impression in Colorado. In addressing this issue we are mindful of the statutory construction maxim that:

> [S]tatutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication.

*Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1076 (Colo.1992); *see also Brooke v. Restaurant Servs., Inc.,* 906 P.2d 66, 68 (Colo.1995); *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422–24 (Colo.1991). Thus, we turn first to the Act itself.

### A.

As its name implies, the Act controls primarily the titling of manufactured homes. For example, the Act sets forth procedures for the sale or transfer of manufactured homes and their titles, § 38–29–106, 16A C.R.S. (1996 Supp.); applications for certificates of title, § 38–29–107, 16A C.R.S. (1996 Supp.); the contents and disposition of certificates of title, §§ 38–29–110, –111, 16A C.R.S. (1996 Supp.); transfer of title, § 38–29–112, 16A C.R.S. (1996 Supp.); surrender, cancellation, and purging of titles, § 38–29–118, 16A C.R.S. (1996 Supp.); and so forth. The Act also governs security interests in manufactured homes, § 38–29–125, 16A C.R.S. (1996 Supp.); mortgages on manufactured homes, §§ 38–29–126 to –136, 16A C.R.S. (1996 Supp.); and liens on manufac-

tured homes, § 38–29–137, 16A C.R.S. (1996 Supp). By controlling how a mobile home is converted from personal property to residential real property, the Act dictates the tax status of mobile homes.

The Act is administered by the Director of the Department of Revenue (Director). § 38–29–104, 16A C.R.S. (1996 Supp.). On a local level, the Act is implemented by the Director's authorized agent, "[t]he county clerk and recorder in each of the counties of the state, except in the city and county of Denver."[13] § 38–29–105, 16A C.R.S. (1996 Supp.). The Director's agents are empowered to administer the "terms and provisions" of the Act and "the rules which may from time to time be adopted for the administration thereof in the county in which such authorized agent holds office." *Id.*

To understand the operation of the certificate of title and purging scheme, four sections in the Act are relevant. §§ 38–29–112(1.5), –114(2), –117(6) & –118(2), 16A C.R.S. (1996 Supp.). Two of these sections address the conversion process for mobile homes that have Colorado titles. *See* §§ 38–29–112(1.5), –118(2), 16A C.R.S. (1996 Supp.). The remaining two sections address mobile homes that do not have Colorado titles. *See* §§ 38–29–114(2), –117(6), 16A C.R.S. (1996 Supp.).

The two provisions of the Act that pertain to purging of Colorado certificates of title provide as follows:

> The *purchaser or transferee* of a manufactured home which becomes permanently affixed at an existing site or is transported to a site and is permanently affixed to the ground so that it is no longer capable of being drawn over the public highways *shall present a certificate of transfer as required in subsection (1) of this section, together with his application for purging a manufactured home title,* to the authorized agent of the county or city or city and county in which such manufactured home

---

**13.** In Denver, the Director's authorized agent is the manager of revenue. § 38–29–105, 16A

C.R.S. (1996 Supp.).

is located, and said manufactured home shall become real property. The provisions of articles 30 to 44 of this title and of any other law of this state shall be applicable to manufactured homes which have become real property pursuant to this subsection (1.5) and to instruments creating, disposing of, or otherwise affecting such real property wherever such provisions would be applicable to estates, rights, and interests in land or to instruments creating, disposing of, or otherwise affecting estates, rights, and interest in land.

§ 38–29–112(1.5), 16A C.R.S. (1996 Supp.) (emphasis supplied).

The owner of any manufactured home for which a Colorado certificate of title has been issued, upon its being permanently affixed to the ground so that it is no longer capable of being drawn over the public highways, *may* surrender his certificate of title thereto and file with the authorized agent of the county or city and county in which such manufactured home is located a request for purging of the mobile home title; and upon said owner's procuring the consent thereto of the holders of any mortgages noted on the certificate of title and shown to be unreleased, said manufactured home shall become real property. The provisions of articles 30 to 44 of this title and any other law of this state shall be applicable to manufactured homes which have become real property pursuant to this subsection (2) and to instruments creating, disposing of, or otherwise affecting such real property wherever such provisions would be applicable to estates, rights, and interests in land or to instruments creating, disposing of, or otherwise affecting estates, rights, and interests in land.

§ 38–29–118(2), 16A C.R.S. (1996 Supp.) (emphasis supplied).

While section 38–29–112(1.5) pertains to *purchasers* or *transferees* of mobile homes "which become[ ] permanently affixed," section 38–29–118(2) covers the *owners* of mobile homes. In the former, the Act mandates that the purchaser or transferee present a certificate of transfer along with an application to purge the title to convert the mobile home into residential real property.[14] In the latter, section 38–29–118(2), the Act is permissive, the owner "may" purge title if the mobile home becomes permanently affixed and the owner obtains consent from any mortgage holders. *See ENT Fed. Credit Union v. Chrysler First Fin. Servs. Corp.*, 826 P.2d 430, 432 (Colo.App.1992). "Owner" is defined in the Act as "any person, association of persons, firm, or corporation in whose name the title to a manufactured home is registered." § 38–29–102(10), 16A C.R.S. (1996 Supp.). "Purchaser or transferee" is not defined in the Act.

The two provisions of the Act that do not require purging of title prior to conversion of a mobile home to residential real property provide as follows:

Any purchaser of a new manufactured home that is transported to a site and permanently affixed to the ground so that it is no longer capable of being drawn over the public highways shall not be required to procure a certificate of title thereto as is otherwise required by this article, and said home shall become real property. The provisions of articles 30 to 44 of this title and of any other law of this state shall be applicable to manufactured homes which have become real property pursuant to this subsection (2) and to instruments creating, disposing of, or otherwise affecting such real property wherever such provisions would be applicable to estates, rights, and interests in land or to instruments creat-

---

14. Failure to comply with the provisions of § 38–29–112(1), 16A C.R.S. (1996 Supp.), which require that the certificate of title be transferred upon sale of the mobile home, is punishable as a misdemeanor:

Any person who violates any of the provisions of subsection (1) of this section is guilty of a misdemeanor and, upon conviction there-

of, shall be punished by a fine of not less than two hundred fifty dollars nor more than one thousand dollars, or by imprisonment in the county jail for not less than ten days nor more than six months, or by both such fine and imprisonment.

§ 38–29–112(2), 16A C.R.S. (1996 Supp.).

ing, disposing of, or otherwise affecting estates, rights, and interests in land.

§ 38–29–114(2), 16A C.R.S. (1996 Supp.).

If any person acquires the ownership in a manufactured home for which a certificate of title has been issued under the laws of a state other than the state of Colorado and such home is transported to a site where it is permanently affixed to the ground so that it is no longer capable of being drawn over the public highways, such person shall not be required to procure a new certificate of title as is otherwise required by this article, and said manufactured home shall become real property. The provisions of articles 30 to 44 of this title and of any other law of this state shall be applicable to manufactured homes which have become real property pursuant to this subsection (6) and to instruments creating, disposing of, or otherwise affecting such real property wherever such provisions would be applicable to estates, rights, and interests in land or to instruments creating, disposing of, or otherwise affecting estates, rights, and interests in land.

§ 38–29–117(6), 16A C.R.S. (1996 Supp.).

Hence, the certificate of title need not be purged in order for the mobile home to become real property if: (1) a certificate of title was never issued and the new mobile home is to be transported directly from the manufacturer to the site where it is to be permanently affixed, § 38–29–114(2), or (2) the certificate of title is issued from a state other than Colorado, § 38–29–117(6).

The Larimer County Assessor's Office brochure sets forth guidelines, pursuant to the Act, and provides the following information on and procedure for the conversion process:

**The value of your property may increase. Please be aware of the following:**

Once your home is secured to the ground, the mobile home becomes real estate in all respects.

1. The original title to the home is surrendered to the Colorado State Motor Vehicle Division to be purged from their records. This is handled through the Assessor's Office.

2. The home is then conveyed by deed, like all real property, from this point on.

3. The home is now assessed as an improvement of that parcel of land.

4. It is valued as residential real property—which may increase the actual value for ad valorem tax purposes.

5. It may be financed like residential real property with an escrow account for taxes.

6. It is collected, advertised, sold and redeemed as residential real property if the taxes are not paid.

7. This change in classification is irreversible.

In order to accomplish this change in classification for ad valorem tax purposes from a moveable manufactured home to residential real property, you must meet the requirements listed in this brochure for permanent foundations as required by the Larimer County Building Department.

The Larimer County brochure further provides as follows:

**Instructions for Purging Mobile Home Titles and Converting Mobile Homes to Real Property**

1. The mobile home must be on a permanent foundation.

2. An inspection by the appropriate Building Department must be completed. There may be an inspection fee. Call the appropriate Building Department for an appointment . . .

   . . . .

3. The Assessor's Office will need a copy of the Certificate of Occupancy issued by the Building Department or confirmation by the Building Department that all requirements have been met to convert the home to residential real property.

4. The *Owner's Request to Purge a Mobile Home Title* and the *Owner's Re-*

*quest to Reclassify Improvements* are to be signed by the owners.

5. The *Lender's Request to Purge a Mobile Home Title* is to be signed by the lending institution.

6. All papers must be signed and returned to this office. A check payable to the Larimer County Clerk and Recorder for the $5 recording fee must accompany the forms.

7. We also need the *ORIGINAL* title for the mobile home. It will be sent to the Department of Motor Vehicles in Denver and purged.

(Emphasis in original.)

Together, the Act and the Larimer County Assessor's Office brochure provide a comprehensive framework for the conversion process. Where the Act is nonspecific, *e.g.*, in defining the meaning of "permanently affixed," the brochure prescribes the particular details of the physical conversion process.[15]

### B.

We now consider whether the Act preempts the traditional common law of fixtures so that a mobile home can become residential real property only by means delineated in the Act and local implementation thereof. Although this issue has not been addressed by Colorado courts, it was considered by the United States Bankruptcy Court for the District of Colorado in *In re Harris*, 166 B.R. 163 (Bankr.D.Colo.1994). In *Harris*, the creditor had purchased real property in a foreclosure sale and one of the issues before the bankruptcy court was if a mobile home located on the property was included in the deed of trust. The debtor claimed that because he did not follow the purging process under section 38–29–112(1.5), 16A C.R.S. (1996 Supp.) to have the property treated as real estate for tax purposes, it was not a fixture. The debtor further claimed that he was entitled to a homestead exemption. The

bankruptcy court found that if the mobile home, located on the real property, was a fixture, the debtor had waived the homestead exemption by executing a deed of trust. 166 B.R. at 164. The bankruptcy court concluded that, under common law, the mobile home had become a fixture and was annexed to the real property. In reaching this conclusion, the bankruptcy court was not dissuaded by the fact that title to the mobile home had not been purged pursuant to the Act:

> The Court does not find that Section 38–29–112(1.5) C.R.S. prevents the Court from holding that the Mobile Home became real property. Under that provision, a manufactured home becomes real property upon the inability of the home to be transferred [transported] and the filing of an application to purge the manufactured home title with the county agent where the home is located. The statutory framework does not prevent this Court from determining in this situation that the home was *de facto* part of the property.

*Harris*, 166 B.R. at 166. The court did not explain further its reasoning for concluding that the Act was not an exclusive means for converting a mobile home from personal to real property. Moreover, the bankruptcy court appeared to limit its determination to the particular circumstances before it.

We disagree with the reasoning of the *Harris* court although our application of the Act would lead to the same result. Although there is no language in the Act which specifies that it provides the exclusive means by which a mobile home can be converted from personal property into real property, such a conclusion is necessarily implied by its terms. *See Van Waters & Rogers*, 840 P.2d at 1076 (common law rights can be statutorily abrogated either expressly or by clear implication). The Act is comprehensive in scope and preempts application of the common law in this area to mobile homes.

### C.

The development of mobile homes or manufactured housing as alternatives to con-

---

15. *See also* Res. 20, 8 CCR 1302–7 (1992) ("The authority having local jurisdiction shall determine the need for stabilizing devices, dependent on wind velocities, climate and weather conditions.").

ventional housing has raised many new questions of law which are not adequately addressed by the common law. As a result, the legislature has been compelled to intervene and to adopt specific legislation regulating mobile homes. For example, sales of manufactured homes are separately regulated. *See* §§ 12–51.5–101 to –207, 5B C.R.S. (1991) (repealed on July 1, 1992 pursuant to § 12–51.5–102(5)(b), 5B C.R.S. (1991)).[16] In addition, the normal forcible entry and detainer law does not apply to owners of mobile homes who are tenants in a mobile home park. Rather, the legislature has developed specific procedures to address such rentals. *See* §§ 38–12–200.1 to –217, 16A C.R.S. (1982 & 1996 Supp.) ("Mobile Home Park Act"). The lease must be in writing and a notice to quit must allow the tenant at least thirty days (extended to 60 days for a multi-section mobile home) to move his or her mobile home. § 38–12–202(1)(a), (c), 16A C.R.S. (1982 & 1996 Supp.). The Mobile Home Park Act recognizes that a mobile home continues to belong to the owner and does not become part of the lot upon which it is placed even though it is installed in a permanent manner with a permanent foundation. *See* § 38–12–201.5(2), 16A C.R.S. (1982) (defining "mobile home"). This dichotomy of ownership, where the mobile home and the lot often are separately owned and intended to remain so, necessitates special statutory treatment.

The Act now before us incorporates many features of the common law principles of fixtures and appurtenances but, in important respects, it deviates from the common law. By mandating that a mobile home becomes real property only if it is "permanently affixed to the ground so that it is no longer capable of being drawn over the public highways," the controlling statutory provisions adopt the prevailing common law fixtures test as it would apply to mobile homes.

§§ 38–29–112(1.5), –114(2), –117(6), –118(2), 16A C.R.S. (1996 Supp.). Under the common law, in order to qualify as a fixture or an appurtenance, the mobile home would have to be: (1) annexed to the real property; (2) adapted to the use of the real property; and (3) intended as a permanent accession to the real property. *See Ferganchick v. Johnson*, 28 Colo.App. 448, 450, 473 P.2d 990, 992 (1970).[17] That the mobile home is "permanently affixed to the ground so that it is no longer capable of being drawn over the public highways" is proof positive that the three common law criteria have been met. First, the statutory "permanently affixed to the ground" requirement sufficiently satisfies the first prong of the common law test, that the mobile home be annexed to the property. Second, a mobile home is inherently adapted to real property (this prong of the fixture test is more probative for analysis of other types of fixtures). Last, the intent of permanency is amply evidenced by the physical steps that must be taken in order to permanently affix the mobile home.

The Act, however, adds a significant requirement to the conversion process which is not found at common law: that is, if a Colorado certificate of title has been issued, the title must be purged prior to completion of the conversion process. *See* §§ 38–29–112(1.5), –118(2), 16A C.R.S. (1996 Supp.). Because the Act has this additional requirement, it is inconsistent with and preempts the common law. In contrast, if no Colorado title has been issued, the conversion process takes place without purging by statutory operation that mirrors the common law process. *See* §§ 38–29–114(2), –117(6), 16A C.R.S. (1996 Supp.). In either case, by subsuming the common law test (and in the case of mobile homes with Colorado titles by adding the purging requirement), the Act necessarily supplants rather than supplements the common law. Thus, the Act is not merely confirmatory of the common law.

---

**16.** Sales of mobile homes are now regulated under the Titles to Manufactured Homes Act, §§ 38–29–101 to –143, 16A C.R.S. (1996 Supp.).

**17.** Some jurisdictions add a fourth prong to the test: the likelihood that the removal of the fixture

would cause significant injury to the real property. *See, e.g., Harris,* 166 B.R. at 164–65 (citing *Corning Bank v. Bank of Rector,* 265 Ark. 68, 576 S.W.2d 949 (1979)).

The state and localities have an interest in controlling the conversion process and ensuring that mobile homes are properly and safely converted into residential real property. Thus, the certificate of occupancy is only issued upon a showing that the mobile home has been adequately affixed. To permit the process to take place according to common law and outside the parameters of the Act including its local enforcement, would undermine the comprehensive treatment of the statutory conversion process. *See Brooke*, 906 P.2d at 68 (a comprehensive statutory scheme "would indicate 'by clear implication' the legislature's intent to preclude common law claims").

█ Leader argues that the Act only controls the tax status of mobile homes. We disagree. As explained by the district court, those statutory sections that pertain to conversion from personal to real property specifically state that mobile homes that have been converted to real property are subject to the provisions of Articles 30 to 44 of Title 38. *See* §§ 38–29–112(1.5), –114(2), –117(6), –118(2), 16A C.R.S. (1996 Supp.). Articles 30 to 44 are not limited to taxes. While Title 38 is entitled "Property—Real and Personal," Articles 30 to 44 pertain to real property only and cover a range of subjects such as "Titles and Interests" in land (Article 30); "Conveyancing and Recording" (Article 35); "Mortgages and Trust Deeds" (Article 38); "Sales on Execution—Lien Foreclosures—Redemption" (Article 39); and "Mortgage, Trust Deeds, and Other Liens—Limitations" (Article 40). Thus, a mobile home that has had its title purged does not become real property solely for tax purposes. Under the express provisions of the Act, the change in status has implications beyond tax treatment.

However, the ramifications of tax treatment are a significant consequence of the statutory conversion process and allowing the common law to function as a supplement to the Act would have inequitable results. Mobile home owners who converted under the Act would be required to pay residential property taxes whereas those that did not purge title under the Act but had taken sufficient steps to meet the common law test, would continue to pay personal property taxes. Despite this difference in tax treatment, the latter class of owners' mobile homes nevertheless would be accorded residential property status for all other purposes. The value of the underlying real property would be enhanced by the common law affixation of a mobile home yet the increased value could not be taxed appropriately under real property taxes.

Furthermore, mobile home owners who converted under the Act would be subjected to the provisions of Articles 30–44 of Title 38, although it is unclear whether conversion under the common law would have similar ramifications. Yet another distinction in treatment would arise because mobile home owners under common law could reverse the real property classification whereas under the statute (as implemented by the Larimer County Assessor's Office), the classification is irreversible.

For all these reasons, we conclude that the Act necessarily abrogates and preempts the common law of fixtures as applied to mobile homes.

### III.

█ Although we find that the Act abrogates the common law in this field, Leader nonetheless is entitled to foreclose on Saunders's mobile home. In particular, we read the requirements of the Act into the "Residential Contract to Buy and Sell Real Estate" entered into between the Kellys and Saunders. *See Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 101 (Colo.1995) (holding in the automobile insurance context that statutorily mandated coverages must be read into insurance policies).

By reading the requirements of the Act into the contract between the Kellys and Saunders, Saunders would have been compelled to purge the certificate of title to the mobile home. Pursuant to the Act, Saunders was not an "owner" at the time the mobile

home became affixed which would give her an option whether or not to purge title to convert the mobile home into residential real property. *See* §§ 38–29–102(10), –118(2), 16A C.R.S. (1996 Supp.). Instead she was a "purchaser." Section 38–29–112(1.5) provides that, as a purchaser of the Kellys' mobile home which was "permanently affixed to the ground so that it [was] no longer capable of being drawn over the public highways," Saunders was required to "present a certificate of transfer . . . together with [her] application for purging a manufactured home title, to the authorized agent." At that point, her mobile home would have become real property and, as real property, the mobile home would be subject to Leader's deed of trust.

Moreover, if the Kellys had followed through on their end of the bargain with the original lender, Universal, the mobile home would have been converted into residential real property pursuant to the Act and the situation presented here would have been avoided. Specifically, the manifest intent of the parties to the deed of trust was to include the mobile home as security for the loan. The loan was contingent on the Kellys' ability to obtain HUD approval which, in turn, was contingent upon the conversion of the mobile home into residential real property. Thus, the Act's requirements also can be read into the note and the deed of trust entered into between the Kellys and Universal.

The paper errors that pervaded the Kellys' ownership of the mobile home should not save Saunders's mobile home from foreclosure by Leader.[18] Saunders failed to comply with the statute and now cannot assert her noncompliance as a defense to Leader's claim. Saunders and the Kellys all benefit-

ted from the loan which, per the intent of all parties concerned, was meant to be secured by both the Property and the mobile home. Saunders cannot successfully raise the statute as a defense to Leader's right to foreclose on the property. Such a defense would not only lead to an unjust result but would be contrary to the statutory mandate as well as the intent of the parties to the deed of trust. We conclude that Leader is entitled to an order of possession for Saunders's mobile home.

## IV.

For the foregoing reasons, we hold that the Act abrogates the common law of fixtures and appurtenances as applied to mobile homes. However, Leader is entitled to foreclose upon the mobile home because Saunders was statutorily required to purge title. Accordingly, we affirm that part of the district court's order finding that the common law did not apply but reject its conclusion that Leader was not entitled to foreclose on Saunders's mobile home. We return the case to the district court for remand to the county court for disposition consistent with our decision.

---

18. By errors, we refer to the Kellys' loss of the certificate of title and Donald Kelly's failure to purge title despite his testimony that it was his and Universal's intent that the mobile home also secure the loan under the deed of trust. In addition, although the mobile home title was not officially transferred to Saunders when she pur-

chased the Property, the parties unequivocally intended to and did transfer the mobile home. *See* discussion *supra* p. 1346. There is no dispute that Saunders purchased the mobile home from the Kellys. Thus, Saunders qualifies as a "purchaser or transferee" under § 38–29–112(1.5), 16A C.R.S. (1996 Supp.).