Fred R. YAEKLE, Petitioner,

v.

William C. ANDREWS and Creative Door Systems, Inc., a Colorado Corporation, Respondents.

Wade Chotvacs, Petitioner,

v.

Robert J. Lish and Valerie G. Lish, Respondents.

Nos. 07SC420, 07SC874.

Supreme Court of Colorado, En Banc.

Oct. 20, 2008.

Bell & Pollock, P.C., Bradley P. Pollock, Greenwood Village, Colorado, Attorneys for Petitioner, Fred R. Yaekle.

Boyle/Apelman P.C., Terence P. Boyle, Mark Apelman, Denver, Colorado, Attorneys for Respondents, William R. Andrews and Creative Door Systems, Inc.

William C. Hibbard, Leslie A. Goldstein, Steamboat Springs, Colorado, Attorneys for Petitioner, Wade Chotvacs.

Klauzer & Tremaine, LLC, James "Sandy" Horner, Steamboat Springs, Colorado, Attorneys for Respondents, Robert J. Lish and Valerie G. Lish.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

We granted certiorari on two cases, *Yaekle v. Andrews,* 169 P.3d 196 (Colo.App.2007) and *Chotvacs v. Lish,* No. 05CA1369, 2007 WL 1366293 (Colo.App. May 10, 2007) (unpublished), which present substantially the same issue of statutory interpretation regarding provisions of the Dispute Resolution Act ("the Act"), sections 13–22–301 to –313, C.R.S. (2008).[1] We now consolidate the cases and decide them together.

---

**1.** In *Yaekle v. Andrews,* we granted certiorari on two issues:

 1. Whether the Dispute Resolution Act, section 13–22–301 et seq., C.R.S. (2007) (the "Act"), requires that a settlement agreement reached through mediation be in writing and signed by all parties in order to be enforceable.

 2. Whether the Dispute Resolution Act controls the enforceability of a settlement agreement formed by the parties' actions subsequent to mediation or whether courts can rely on common law contract formation principles to enforce such an agreement.

In *Chotvacs v. Lish,* we granted certiorari on one issue:

In the first of the cases, Fred Yaekle appeals the decision of the court of appeals in *Yaekle v. Andrews* affirming the district court's order granting judicial enforcement of a revised settlement agreement. *See* 169 P.3d at 200. After attending mediation, the parties to this dispute signed a document titled "Basic Terms of Settlement." Formal documents prepared thereafter in an attempt to flesh out and codify the agreement were negotiated by counsel, but not signed by Yaekle. Yaekle now contends that this later agreement, which differs in some ways from the first, is unenforceable because he never signed it. His argument is founded on section 13–22–308 of the Act, which provides that a mediated settlement agreement, if reduced to writing and signed by the parties, can be submitted to a court for approval, whereupon it becomes enforceable as an order of court. Yeakle argues that this section provides the only process by which parties may form a binding agreement once mediation has begun.

In the second case, Wade Chotvacs appeals the determination of the court of appeals in *Chotvacs v. Lish,* No. 05CA1369, 2007 WL 1366293 (Colo.App. May 10, 2007) (unpublished). Chotvacs engaged in court-ordered mediation with his neighbors Robert and Valerie Lish ("Lish") regarding an easement across their land. At the end of the mediation session, the mediator outlined the terms of an apparent agreement between the parties, but neither party signed the agreement. Chotvacs later sought specific performance of the terms of the agreement; Lish countered that the agreement was not binding as it had not been signed. The court of appeals agreed with Lish.

In both cases, the issue is whether section 13–22–308 outlines the exclusive means by which parties can form a binding agreement reached after the parties have engaged in mediation. We hold that section 13–22–308, the process provided by the Act for cementing an agreement as an order of court, is but one means by which parties can enforce a

mediation agreement. However, we also hold that section 13–22–307 protects as confidential certain "mediation communications," and thus bars the use of communications made in the presence or at the behest of the mediator as evidence of a binding contract. Regarding *Yaekle,* we conclude that the parties constructed a binding agreement at common law during their negotiations in the months following the mediation session. Regarding *Chotvacs,* we conclude no final agreement was reached during the mediation session, and none can be inferred from the admissible evidence of the later words and actions of the parties. Accordingly, we affirm the judgments of the court of appeals on separate grounds.

## II. Facts and Procedural History

### A. *Yaekle v. Andrews*

In early 2004 an ownership dispute erupted between Fred Yaekle, the plaintiff below, and William Andrews concerning their collectively owned company Creative Door Systems, Inc. A civil suit was initiated and, in September of that year, the parties agreed to conduct a private mediation at the Denver office of Judicial Arbitration and Mediation Services. After a half-day session with counsel for the parties in attendance, the mediator filled out a form outlining the "basic terms of settlement." The form (the "September agreement") was signed by both parties and stipulated that Andrews would pay Yaekle for his share of the company over a period of roughly ten months. Upon the final payment, the parties would drop their various claims against one another. Andrews's attorney was to draft "formal documents" for this agreement within fourteen days. The last line of the agreement read, "[t]he parties understand that this document is a binding enforceable agreement."

Andrews began making payments to Yaekle, and the "formal documents" were drafted ("October documents"). However, the

Whether the Dispute Resolution Act, sections 13–22–301 to 13–22–313, C.R.S. (2007), requires that a settlement agreement reached through mediation be in writing and signed by all the parties in order to be enforceable.

While both these issues focus on the 2007 statute, the provisions remain unchanged in 2008.

terms of the October documents became the subject of a new dispute and further negotiations between the parties through their counsel. Counsel exchanged a number of letters regarding specific provisions of the October documents. Central to these discussions was the parties' mutual release from liability. The mutual release of the October documents included one provision in which Andrews released Yaekle from liability, and another outlining Yaekle's release of Andrews. The language of the two provisions was not identical, and, in a string of exchanges between attorneys, counsel for Yaekle demanded that the provisions be made mirror images of each other.

Throughout the extensive discussions about these provisions, neither party noted that those provisions contained in the October documents arguably created a broader release for both parties than had been set out in the September agreement. The October documents maintained that each party would release the other "from any and all past, present or future claims ... *known or unknown*" that had or may have thereafter accrued against him. (Emphasis added). The September agreement merely provided for the mutual release of all claims that "could or did arise between the parties *known*" prior to the day it was signed. (Emphasis added). In the nine correspondences between counsel regarding the October documents, the apparent addition of liability release for yet unknown claims was not mentioned by either party. In December, Andrews's attorney sent a revised settlement agreement to Yaekle's attorney containing all of the revisions Yaekle had demanded; namely, settlement documents containing identical release provisions for the two parties ("December agreement").

Around the same time, Andrews initiated a criminal investigation against Yaekle, which culminated in Yaekle's arrest in January 2005.[2] Although the charges were later dismissed, Yaekle thereafter refused to sign the December agreement, apparently suspecting that Andrews was seeking the liability release to avoid future claims related to the arrest.

In January, the trial court overseeing the pending civil suit issued a Notice of Dismissal for Failure to Prosecute. Yaekle responded with a Notice of Pending Settlement in which he stated, "[t]he parties finally reached an agreement concerning the acceptable content and terminology to be set forth in the settlement documents. [Andrews] submitted a final Settlement Agreement and Mutual Release [in December]." However, Yaekle's counsel asked for more time to evaluate the agreement in light of Yaekle's arrest, which the trial court granted.

After several more delays and further threats by the trial court to dismiss the case, Andrews moved for "judicial enforcement" of the December agreement. Yaekle countered with a request that the September agreement be enforced, arguing the December agreement was unenforceable in spite of his earlier assertion to the court that it was a "final" agreement. After considering the lengthy negotiations between counsel concerning the December agreement, the trial court found that the parties had agreed to and were now bound by its terms, and granted Andrews's motion.

The court of appeals affirmed the order after determining that the requirements of the Dispute Resolution Act had been met for judicial enforcement of a settlement agreement.

## B. *Chotvacs v. Lish*

Wade Chotvacs engaged in litigation with Lish concerning an easement that gave him access across Lish's property. The trial court ordered the parties to attempt mediation. After a thirteen-hour mediation session led by an attorney-mediator, the parties allegedly reached an agreement. The mediator drafted two pages of handwritten notes that outlined the terms of a proposed settlement. The document was not signed by the parties or their attorneys.

---

**2.** Andrews alleged that Yaekle stole from the company by running a "secret and unlawful business."

Later that evening after the mediation session, Chotvacs removed a fence on Lish's property pursuant to the terms of the agreement. The following day, Lish informed Chotvacs that he did not consider the agreement binding, and that he was no longer interested in pursuing the course of action it laid out. Chotvacs subsequently brought a suit for breach of contract and specific performance, attaching the mediator's notes as evidence of the allegedly violated contract.

Relying on court of appeals precedent, which required that the agreement arising from mediation be signed by both parties in order to be enforceable by a court, the trial court issued a judgment on the pleadings in favor of Lish as per Colorado Rule of Civil Procedure Rule 12(b)(3). The court of appeals affirmed in an unpublished opinion.

## III. The Dispute Resolution Act

The Dispute Resolution Act structures efforts to resolve disputes through mediation rather than litigation. *See* §§ 13–22–301 to – 313. Two provisions of the Act are of special importance here.

The first of these, section 13–22–307 ("section 307"), protects all mediation communications as confidential. "Mediation communications" are in turn defined as "any oral or written communication prepared or expressed for the purposes of, in the course of, or pursuant to, any mediation services proceeding." § 13–22–302(2.5), C.R.S. (2008). Explicitly excepted from this definition are written agreements to enter into mediation and any "final written agreement ... which has been fully executed." *Id.* Importantly, protected mediation communications are generally inadmissible as evidence in later judicial proceedings. *See* § 13–22–307(3), C.R.S. (2008).

The second provision of special concern here is section 13–22–308(1) ("section 308"), which outlines a process by which parties can turn an agreement reached during mediation into an enforceable court order. Specifically, section 308 states:

If the parties involved in a dispute reach a full or partial agreement, the agreement upon request of the parties shall be reduced to writing and approved by the parties and their attorneys, if any. If reduced to writing and signed by the parties, the agreement may be presented to the court by any party or their attorneys, if any, as a stipulation and, if approved by the court, shall be enforceable as an order of the court.

Under this section, parties can turn an agreement reached during mediation into an enforceable court order after reducing it to writing, signing it, and submitting it as a stipulation to the court for its approval. *See id.*

Based on these two provisions, Yaekle and Lish argue that the Dispute Resolution Act abrogates the common law of contracts in the context of mediation proceedings and puts section 308 in its stead. Under their view, the only way for parties to reach a binding agreement in mediation is to follow those steps set out in section 308. We disagree.

## IV. Analysis

We have not before considered whether section 308 establishes the exclusive method by which parties can arrive at a binding agreement through mediation. However, the court of appeals faced this issue in *National Union Fire Ins. Co. of Pittsburgh v. Price,* 78 P.3d 1138 (Colo.App.2003).[3] In *Price,* the parties attended a mediation session after Price asserted tort claims against an insurance company. *See id.* at 1139. After the session, the insurance company sought to establish as binding an oral agreement allegedly finalized during mediation. *See id.* The court of appeals noted that section 308 "is the only provision in the Act that addresses settlements." *Id.* at 1141. Reasoning under the canons of statutory construction that the inclusion of this one method meant the exclusion of others, the court of appeals concluded that section 308 "describes the only method for obtaining court enforcement of a mediated settlement agreement." *Id.*

---

**3.** We granted certiorari on *Price* in order to review many of the same issues presented by the two instant cases; however, the case was settled before it reached us and the appeal was dismissed. *See* No. 03SC527 (Colo. Nov.17, 2003) (granting certiorari).

(citing *City of Arvada v. Colo. Intergovernmental Risk Sharing Agency*, 19 P.3d 10 (Colo.2001)). Consequently, the court of appeals reversed the trial court's order granting enforcement of the oral agreement. *See id.* at 1142.

■ However, the court of appeals did not consider the impact such an interpretation of the Dispute Resolution Act had on the common law. By reading section 308 to be exclusive, the court of appeals in *Price* suspended the operation of common law contract principles while parties are engaged in mediation. Significant among those methods excluded by implication under the reading set out in *Price* are common law contract principles that allow for the formation of contracts without the signatures of the parties bound by them. *See, e.g., I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo.1987) (stating that the parties' agreement on essential terms of a contract as required to establish a contract can be inferred from their conduct or oral statements); *Smith v. Multi–Financial Sec. Corp.*, 171 P.3d 1267, 1272 (Colo.App.2008) (stating that nonsignatories may nonetheless be bound by agreements to arbitrate based on common law contract principles). This reading also abandons the long-standing common law rule that a settlement agreement can be governed by and found enforceable under common law contract principles. *See H.W. Houston Constr. Co. v. Dist. Court*, 632 P.2d 563, 565 (Colo.1981) (holding that a court may only enforce a settlement agreement if it constitutes an enforceable contract); *Goltl v. Cummings*, 152 Colo. 57, 380 P.2d 556 (1963) (concluding that a settlement is effectively a contract to end judicial proceedings); *Pring v. Udall*, 95 Colo. 23, 29, 31 P.2d 1113, 1116 (1934) (stating that a "[m]eeting of the minds" as to the terms and conditions of settlement is essential to the agreement's enforceability). These traditional tenets of common law contracts and settlement, which are sensitive to the requirements of justice, stand in stark contrast to those formulaic requirements imposed by an exclusive reading of section 308 under which, in order to be binding, any agreement reached after the commencement of mediation would need to be (1) reduced to writing,

(2) signed by the parties, (3) submitted to the court as a stipulation, and (4) approved by the court. Such a marked shift in the law begs close examination.

■ This court has previously considered what it takes for a statute to effect such an abrogation of the common law. "[A]s a matter of statutory interpretation, changes in the common law ... will be recognized only when they are expressly mandated or necessarily implied by subsequent legislation." *Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo.2008) (citing *Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997)); *see also Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004) ("[W]e acknowledge and respect the General Assembly's authority to modify or abrogate common law, but can only recognize such changes when they are clearly expressed."). As such, before accepting the conclusion that the common law of contracts is suspended when parties enter mediation, we must find either express intent to that end on behalf of the General Assembly or necessity in the language of the provisions. The Dispute Resolution Act provides us with neither.

Nowhere in the Act did the General Assembly express its intent to abrogate the common law of contracts during mediation proceedings. *See* §§ 13–22–301 to –313. The Act's silence on this matter weighs against Yaekle's and Lish's conclusion and in favor of leaving the common law of contracts intact.

■ Nor is the abrogation of common law contract principles the necessary implication of the statute's provisions; rather, the language of the statute urges quite the contrary. *Cf. Clancy Sys. Int'l*, 177 P.3d at 1237. "Our primary duty in construing statutes is to give effect to the intent of the General Assembly, looking first to the statute's plain language. If a statute is clear and unambiguous on its face, then we need not look beyond the plain language." *Vigil*, 103 P.3d at 327 (citing *In re 2000–2001 Dist. Grand Jury in and for First Judicial Dist.*, 97 P.3d 921, 924 (Colo.2004); *Garhart ex rel. Tinsman v. Columbia/HealthONE, L.L.C.*, 95 P.3d 571, 591 (Colo.2004)). The language

of both sections 308 and 307 indicates the Act was not intended to carve out a space in which the common law of contracts did not operate, but rather complement those principles and provide ways for parties to streamline the enforcement of mediated agreements as court orders.

Turning first to section 308, the language of the provision indicates the common law of contracts was intended to remain in effect in a number of ways. As an initial observation, the language of section 308 is riddled with conditionals: "*If* reduced to writing ... the agreement *may* be presented to the court, ... and, *if* approved, ... it shall be enforceable as an order of the court." § 13–22–308 (emphasis added). The voluntary nature of the procedure outlined in section 308 indicates that the General Assembly anticipated there would be other ways to resolve mediated disputes. It did not mandate a single method that must be followed for the formation of a binding agreement once mediation has begun.[4]

More importantly, the language of the statute is very precise: section 308 only provides a method for directly converting an agreement into one that is "enforceable *as an order of court.*" (Emphasis added). It does not address the methods required for forming those agreements. Contrary to the canons of statutory construction, Yaekle's argument ignores this last phrase in the provision. *See Cacioppo v. Eagle County Sch. Dist. Re–50J,* 92 P.3d 453, 463 (Colo.2004) ("[W]e afford the language of ... statutes their ordinary and common meaning [and] construe statutory ... provisions as a whole, giving effect to every word and term contained therein, whenever possible." (quotations omitted)); *see also* § 2–4–201(1)(b), C.R.S. (2008) ("The entire statute is intended to be effective"). Cementing the agreement as an order of court provides the parties with certain benefits of judicial efficiency. For example, it means that a party harmed by a later violation of that agreement can bring an enforcement action rather than being forced to litigate on the issue of contract formation, and that the court wields the power to hold the violator in contempt or otherwise direct specific performance. *See* § 13–1–114(1)(c), C.R.S. (2008) ("Every court has power to compel obedience to its lawful ... orders, ... and to the lawful orders of its judge out of court in action or proceeding pending therein); C.R.C.P. 107 (Remedial and Punitive Sanctions for Contempt).

Often, parties to binding agreements do not seek court enforcement of the agreement at all, and may come to court only disputing whether the contract has been breached or the damages for a breach. A statutory provision specifically providing for an enforcement mechanism, and not addressing common law contract formation, does not prevent parties from reaching a binding agreement in the absence of court enforcement. As we read it, section 308 was not meant to limit the ways by which parties may form a binding agreement. Rather, it extends those benefits afforded parties who have litigated an issue to those who have resolved an issue through mediation. Thus, the whole of section 308 merely provides a method of turning an agreement into an order of court; it does not speak to or limit the ways in which a binding agreement can be formed.

Therefore, the language of section 308 militates against the conclusion that the Act abrogates the common law of contracts in the context of mediation proceedings. It neither expressly mandates the abrogation of the common law, nor necessarily implies such a consequence. Indeed, the language appears to contemplate other methods of forming a binding agreement. As such, insofar as its reasoning is inconsistent with this opinion, we now disapprove of *Price.*[5]

---

4. Prior to 1991 amendments to the Act, the process outlined by section 308 was compulsory on the parties if they indeed reached an agreement in mediation. *See* § 13–22–308, C.R.S. (1983). Even under the former statutory language, though, our interpretation would be no different. The specificity of the section and the circumstance it considers weigh against understanding it as a restraint on contract formation.

5. While we here disagree with the reasoning in *Price* regarding the Dispute Resolution Act, our understanding of the statute would have likely led to the same result in that case, as the analysis would closely track that set out in the discussion

Next we turn to section 307 and the more difficult issue of whether this provision necessitates an abrogation of the common law of contracts in the context of mediation proceedings, *cf. Clancy Sys.*, 177 P.3d at 1237, thereby leaving section 308 as the only remaining path by which parties may reach a binding agreement. Section 307 provides for the confidentiality of all "mediation communications" except in a few, rare circumstances of no moment here. *See* § 13–22–307(2), C.R.S. (2008).[6] "Any mediation communication that is disclosed in violation of this [confidentiality protection] shall not be admitted into evidence in any judicial or administrative proceeding." § 13–22–307(3), C.R.S. (2008).

As Yaekle and Lish see it, without access to mediation communications, there is nothing from which a common law contract may be substantiated. They conceive of "mediation communications" as covering all those words and actions of the parties that might be used in court to show that a binding contract has been formulated. Indeed, the parties imply that, so sweeping is the confidentiality provided by section 307, a mediated dispute could not produce an agreement binding on the parties without executing the process outlined in section 308.

■ However, this argument reads the definition of "mediation communication" too broadly. Section 13–22–302(2.5) defines "mediation communication" as

> any oral or written communication prepared or expressed for the purposes of, in the course of, or pursuant to, any media-

tion services *proceeding* or dispute resolution *proceeding*, including, but not limited to, any memoranda, notes, records, or work product of a mediator, mediation organization, or party.

(Emphasis added). This definition covers only those communications expressed "for the purposes of, in the course of, or pursuant to" specific mediation proceedings. *Id.* Black's Law Dictionary defines "proceeding" as, *inter alia*, "[t]he business conducted by a court or other official body; *a hearing.*" Black's Law Dictionary 1241 (8th ed.2004) (emphasis added); *see also* Black's Law Dictionary 45 (8th ed.2004) (defining "adjudicatory proceeding" in reference to "adjudicatory hearing"). The Act's definition of "mediation communication" is therefore careful not to extend to all communications that may in some way or another be related to the mediation; the definition does not cover all communications made with an eye to resolving the dispute once parties have agreed to mediation. Rather, "mediation communications" are limited to those made in the presence or at the behest of the mediator. Thus, section 307 does not, as the parties contend, wholly rob common law contract principles of anything on which to operate. Communications or negotiations that concern the dispute but are not connected to specific mediation services proceedings are not contemplated by the definition of "mediation communication" and therefore are not protected as confidential under section 307.[7]

---

6. of *Chotvacs v. Lish, infra* Part V.B. Specifically, the alleged oral agreement reached in *Price* would not have been admissible under section 307's confidentiality protections and so could not have been enforced.

6. Section 13–22–307 states, in pertinent part:

> (2) Any party or the mediator or mediation organization in a mediation service proceeding or a dispute resolution proceeding shall not voluntarily disclose or through discovery or compulsory process be required to disclose any information concerning any mediation communication or any communication provided in confidence to the mediator or a mediation organization, unless and to the extent that:
> (a) All parties to the dispute resolution proceeding and the mediator consent in writing; or

> (b) The mediation communication reveals the intent to commit a felony, inflict bodily harm, or threaten the safety of a child under the age of eighteen years; or
> (c) The mediation communication is required by statute to be made public; or
> (d) Disclosure of the mediation communication is necessary and relevant to an action alleging willful or wanton misconduct of the mediator or mediation organization.

7. Among other things, this reading ensures that a party may not enter into a common law settlement contract outside an ongoing mediation in an attempt to escape its costs, and later be protected by the Act's confidentiality provisions by successfully arguing that no side agreement existed, or at least none that a court could consider. Thus, the open mediation negotiations the Act seeks to protect cannot be manipulated

Nonetheless, there may well be some cases wherein an agreement is reached among parties in mediation, but, because all mediation communications are protected as confidential, a binding contract cannot be proven. In other cases, the final and fully executed agreement may be the only admissible evidence of a contract, and thus a court's determination as to whether or not a contract has been established at common law is determined from the one document alone. However, protecting communications as confidential is distinctly different than requiring the abrogation of the common law in all mediation proceedings.

In sum, section 307 of the Dispute Resolution Act protects as confidential those communications made in the presence or at the behest of the mediator, and so may hinder the efficacy of common law contract principles in some circumstances. It does not, however, abrogate those principles entirely. We understand section 307 as protecting the mediation process by its imposition of confidentiality. By protecting mediation communications as confidential, section 307 encourages open and productive negotiation during mediation. Furthermore, section 307 sets out a test for determining the Act's scope through its evidentiary constraints. Thus it is section 307—and not section 308—that dictates the scope of the Act and guides the determination of whether an agreement has been formed and can be enforced within the context of mediation. Section 308 of the Act provides parties engaging in mediation with a method for turning a mediated settlement agreement into an order of court, but does not outline the only way by which a binding agreement can be formed. The Act facilitates alternate dispute resolution without throwing out those methods that allow parties to establish enforceable settlements at common law.

### V. Application

#### A. *Yaekle v. Andrews*

Because Yaekle and Andrews did not submit a signed, written agreement to the court pursuant to section 308, we must assess through the over-extension of the confidentiality

whether the parties have presented any evidence of contract formation that is not protected by the confidentiality provisions of section 307.

When making its determination on the issue of contract formation, the trial court considered the September agreement and the subsequent negotiations between counsel up to and including the December agreement. It also considered other words and actions of the parties, including their representations to the court. We conclude that all of these were properly before the court and unprotected by section 307 of the Act.

 The September agreement was signed by both parties and their lawyers at the conclusion of the half-day mediation session. The September agreement was understood by the parties as a binding and enforceable agreement, as evinced by the document's own provisions and the later representations to the court of both parties. It therefore satisfies the "final written document" exception to mediation communications, and so is not protected by the Act's confidentiality provision. §§ 13–22–302(2.5), 13–22–307(2). Thus, that document was properly before the court, and supplies prima facie evidence of contract formation.

 The October documents were drafted at the behest of the mediator, as stipulated in the September agreement, and so were made "pursuant to" a mediation services proceeding. § 13–22–302(2.5). Had the October documents been themselves fully executed, they would have taken the place of the September agreement as the final written agreement. Thus they would have been admissible under the exception to the mediation communication definition as evidence of contract formation. As it is, though, the October documents are confidential mediation communications not to be contemplated by courts.

 However, the subsequent communications and negotiations concerning the October documents were not protected by section 307, as they did not constitute mediation communications as the Act defines that term.

protections.

*See id.* The discussions were not expressed "for the purposes of" mediation services proceedings; they did not facilitate proceedings and indeed the parties decided not to engage in further mediation proceedings due to the cost. *See id.* These communications were not made "in the course of" mediation services proceedings; they were conducted between counsel to the parties through a series of letters. *See id.* Finally, the communications were not "pursuant to" the mediation as they were neither directed by nor responsive to the mediator or mediation organization. *See id.* Therefore, though expressed in the shadow of mediation, these communications constitute but typical settlement negotiations between parties through their counsel. These subsequent communications include the December agreement, which Yaekle explicitly represented to the trial court as being a final agreement on the content and terminology of the settlement. Therefore, this document too may be considered in making any determination as to whether a contract was formulated.

 Having determined none of the communications between counsel after the mediation session in September enjoy the confidentiality provided by section 307, we now consider whether the December agreement binds the parties. A court may only enforce a settlement agreement if it constitutes an enforceable contract. *See H.W. Houston Constr. Co.,* 632 P.2d at 565 (Colo. 1981). Whether a contract exists is a question of fact to be determined in light of all the surrounding circumstances. *See Rocky Mountain Airways,* 713 P.2d at 887; *see also Compton v. Lemon Ranches, Ltd.,* 972 P.2d 1078, 1080 (Colo.App.1999); *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail,* 892 P.2d 367, 372 (Colo.App.1994). "Appellate courts are bound by [such findings of fact] when ... there is competent evidence in the record to support the findings." *Rocky Mountain Airways,* 713 P.2d at 887 (discussing jury determinations on the issue of contract formation) (citing *Aurora v. Loveless,* 639 P.2d 1061, 1063 (Colo.1981)); *Vigil v. Pine, Jr.,* 176 Colo. 384, 387, 490 P.2d 934, 936 (1971)).

Here, the trial court concluded, after properly considering all the communications presented to it, that the parties had entered into a subsequent agreement regarding the dispute's settlement by way of the December agreement. The trial court found, and the record supports:

(1) the parties agreed to the language in the December agreement which differed from that indicated by the September agreement: Andrews's counsel drafted the language, and Yaekle's twice insisted it be included in additional places in the documents.

(2) the contested language was included in the release verbatim at Yaekle's urging.

(3) the agreement was sent to Yaekle in December and thereafter was not contested.

(4) in January, Yaekle represented to the court that the "parties finally reached an agreement concerning the acceptable content and terminology to be set forth in the settlement documents."

(5) in February, Yaekle acknowledged that the parties had entered into a Stipulation for Resolution, but indicated the parties might need to *renegotiate* the agreement due to Yaekle's arrest.

These findings, which we see no reason to upset, support the trial court's and court of appeals' conclusion that the December agreement constitutes a contract by which the parties are bound and that a court can enforce. The terms of the contract are unambiguous, were negotiated by the parties, and the contract offered by Andrews followed every one of Yaekle's requirements. Yaekle accepted the offer, as clearly shown through his counsel's representations to the court. *See Scoular Co. v. Denney,* 151 P.3d 615, 619 (Colo.App.2006) (discussing acceptance of an offer as "words or conduct that, when objectively viewed, manifests an intent to accept the offer").

For the foregoing reasons, we affirm the order of the court of appeals.

## B. *Chotvacs v. Lish*

As with the dispute between Yaekle and Andrews, the requirements of section 308 were not satisfied during the mediation between Chotvacs and Lish. The alleged agreement, while reduced to writing, was neither signed by the parties nor presented to a court as a stipulation. Having thus established the alleged agreement is not enforceable as an order of court under section 308, the question becomes whether it is enforceable at all as a contract for settlement.[8] Once again, the threshold determination is just what is available to a court as evidence of contract formation in light of section 307's confidentiality provisions.

 The alleged agreement between Chotvacs and Lish was outlined by the attorney mediator at the conclusion of a thirteen-hour mediation session. As it was expressed "in the course of ... a mediation services proceeding," § 13–22–302(2.5), it is protected as a confidential mediation communication under section 307 of the Act unless one of the express exceptions to the mediation communication definition applies.

Nothing about the document suggests the parties thought it a binding agreement. Neither the parties nor their attorneys signed the document, and no provision in the document suggests that it is final or intended to be immediately implemented. As such, unlike the September agreement between Yaekle and Andrews, the document here does not satisfy the exception made for final, written, fully executed agreements provided for in section 13–22–302(2.5). It therefore remains protected as confidential under section 307 of the Dispute Resolution Act.

Absent that document, we are left with a slim record on which to perform a common law contract analysis.[9] There is nothing to

suggest the terms of any agreement; rather there are only Chotvacs's actions in removing the fence (in accordance with the inadmissible document) and Lish's prompt objection to those actions. *Cf. Mestas v. Martini*, 113 Colo. 108, 117, 155 P.2d 161, 164–65 (1944) (holding that, in order for a contract to be enforced, "it is necessary that all the essential terms of the contract must first be established by competent evidence and shown to be definite, certain, clear, and unambiguous"). No other admissible evidence supports Chotvacs's conclusion that he and Lish had entered into a binding agreement. As such, the trial court properly ruled against Chotvacs on his claims for breach of contract and specific performance.

## VI. Conclusion

We hold that section 13–22–308 is not the exclusive means by which parties can form a binding agreement reached after mediation, but that section 13–22–307 protects as confidential those communications made in the presence or at the behest of the mediator. Thus, while common law contract principles are not suspended from operation during mediation, the evidence of contract formation during mediation other than final written and fully executed agreements is generally inadmissible.

Accordingly, the judgments of the court of appeals are AFFIRMED on other grounds.

Justice EID concurs in the judgment only, and Chief Justice MULLARKEY joins in the concurrence.

Justice EID, concurring in the judgment.

While I agree with the majority that there is an enforceable agreement in *Yaekle* but not in *Chotvacs*, I disagree with its conclu-

---

8. Chotvacs insists that his allegation of an enforceable contract is sufficient to overcome the judgment on the pleadings under C.R.C.P. 12(b)(3), from which he now appeals. However, a 12(b)(3) motion is one that calls for the resolution of a legal question when there is no dispute concerning material facts. Here, all parties agree about the timeline of the dispute and the substance of the mediator's written notes regarding the proposed settlement. From the stipulated facts we turn to consider the legal question of contract formation, the determination of

which is unswayed by his insistence that the agreement is binding.

9. While the discussions below primarily focused on *Price's* impact on the dispute, all parties were aware of that case's vulnerability to alteration by this court. Nonetheless, no other evidence was put forward by Chotvacs to support the enforceability of the alleged contract, nor was there any offer for such proof.

sion that oral agreements reached in mediation may be enforceable by court order. Under section 308 of the Dispute Resolution Act, sections 13–22–301 to 13–22–313, C.R.S. (2008), agreements reached in mediation are enforceable by court order only if they are "reduced to writing" and are "signed by the parties." By leaving open the possibility that oral statements made in connection with mediation may end up constituting a binding agreement—despite the fact that the parties have neither reduced their agreement to writing nor signed on the dotted line—the majority needlessly chills the candid and informal nature of mediation discussions. Because the majority's rationale contradicts the Act, I respectfully concur only in the majority's result.

At issue in this case is the meaning of section 308(1), which provides that "[i]f reduced to writing and signed by the parties, the agreement [reached in mediation] may be presented to the court by any party ... and, if approved by the court, shall be enforceable as an order of the court." Thus, an agreement reached in mediation is "enforceable as an order of the court" only if it is (1) in writing; (2) signed by the parties; (3) presented to the court; and (4) approved by the court. These statutory requirements set forth by the legislature are clear and straightforward; without them, a settlement reached through mediation is not "enforceable as an order of the court." Although the majority dismisses the statutory requirements as "formulaic," maj. op. at 1107, and expresses its preference for the more "sensitive" common law rule that recognizes oral agreements, *id.*, it is the legislature's call on the issue, not ours, that must prevail. *See, e.g., Clancy Sys. v. Salazar*, 177 P.3d 1235, 1237 (Colo.2008) ("Although [the legislature] has chosen to give the common law of England full force until repealed by legislative authority, ... it may therefore selectively modify or abrogate portions of that law, at its choice.").

The majority avoids the statutory language by suggesting that the legislature just was not clear enough. Maj. op. at 1107. According to the majority, "before accepting the conclusion that the common law of contracts is suspended when parties enter mediation, we must find either express intent to that end on behalf of the General Assembly or necessity in the language of the provisions." *Id.* at 1107. In my view, section 308 satisfies this standard by setting forth the requirements that an agreement be reduced to writing and signed by the parties before it can be enforced by court order. In the face of this statutory language, the majority states that the Act is "silen[t] on this matter." *Id.* The only thing it could mean by this statement is that the legislature, in order to depart from the common law, would have to state that the writing and signature requirements exclude oral agreements otherwise recognized at common law. But such language would simply be redundant of what is already there. Moreover, we have never required such precision from the legislature. *See, e.g., Leader Fed. Bank for Sav. v. Saunders*, 929 P.2d 1343, 1351 (Colo.1997) (noting that "[a]lthough there is no language in the Act which specifies that it provides the exclusive means by which a mobile home can be converted from personal property into real property, such a conclusion is necessarily implied by [the Act's] terms" that set forth requirements for such conversion).

The majority's focus on the "voluntary nature of the procedure" is similarly misplaced. Maj. op. at 1108. The majority notes that under section 308, an agreement reached in mediation "may" be presented to the court "if" it is reduced to writing and signed by the parties. The majority mistakenly concludes from this language that "the General Assembly anticipated there would be other ways to resolve mediated disputes"—that is, through oral agreements. *Id.* Yet what is voluntary about the language is not, as the majority suggests, whether the prerequisites to enforcing an agreement reached in mediation by court order must be complied with. They must be. Instead, what is voluntary is whether the parties want to seek judicial enforcement of the written and signed agreement in the first place. In other words, the parties "may" choose to seek judicial enforcement of their agreement; if they do, they must abide by the statutory requirements.

My interpretation of section 308 is reinforced by the prior version of the statutory language, which *mandated* that parties who reach an oral agreement in mediation reduce their agreement to writing and submit it for judicial enforcement. As enacted in 1983, the language stated:

> If the parties involved in a dispute reach an agreement, the agreement *shall* be reduced to writing and approved by the parties and their attorneys and *shall* be presented to the court as a stipulation and, if approved by the court, shall be enforceable as an order of the court.

§ 13–22–308, C.R.S. (1983) (emphasis added). The 1991 amendments to the Act, which brought section 308 to its current version, made two significant changes to the language pertinent to this case. § 13–22–308, C.R.S. (1991). First, the parties were relieved of the mandatory obligation to reduce the oral agreement to writing and approve it. Thus, under the current version, the oral agreement "shall be reduced to writing and approved by the parties and their attorneys" only *"upon request of the parties."* Second, the parties were relieved of the mandatory obligation to present the written agreement to the court. Under the current language, the oral agreement, "[i]f reduced to writing and signed by the parties, *may be presented to the court ...."* But nothing in the 1991 amendments relieved the parties of the mandatory obligation to reduce the agreement to writing if they seek court enforcement.

Under my interpretation of section 308, there is no enforceable agreement in *Chotvacs* because the agreement reached in mediation, if any, was not reduced to writing, signed by the parties, or presented to the court.[1] I would therefore affirm the court of appeals' result as well as its rationale, which holds that section 308 "provides the only method for obtaining court enforcement of [an agreement reached in mediation]." *Chotvacs v. Lish*, No. 05CA1369 at 5, 2007 WL 1366293 (Colo.App. May 10, 2007) (unpublished). By contrast, the December agreement in *Yaekle* is enforceable—not because it meets the requirements of section 308, but because it falls outside the purview of the Act. The December agreement was not an agreement reached in mediation; rather, as the majority points out, it was an agreement negotiated through a series of letters after the parties had decided to abandon mediation. Maj. op. at 1111. Thus, the enforceability of the December agreement depends on the application of common law contract principles. I would simply affirm the court of appeals' analysis of these principles. *See Yaekle v. Andrews*, 169 P.3d 196, 199–200 (Colo.App.2007).

While the majority downplays the importance that section 308 has on this case, it reaches the same result by focusing on section 307, which governs confidential mediation communication. As the majority recognizes, under section 307, there is no enforceable agreement in *Chotvacs* because the basis of Chotvacs's claim is communication that was "expressed in the course of ... a mediation services proceeding" and is thus confidential. § 13–22–302(2.5); maj. op. at 1112. The December agreement in *Yaekle* is enforceable, the majority concludes, because the negotiations were not conducted in connection with mediation, and therefore the communication between the parties is not confidential. Maj. op. at 1111. I agree with the majority's section 307 analysis. However, the majority's singular focus on section 307 causes it to miss an important point—namely, that section 307 reinforces section 308's requirements that the agreement be in writing and signed by the parties. In other words, sections 307 and 308 are coextensive and mutually reinforcing.

Section 307 provides that "mediation communication" is confidential and can only be

---

1. The majority describes the agreement as follows: "At the end of the mediation session, the mediator outlined the terms of an apparent agreement between the parties, but neither party signed the agreement." Maj. op. at 1104. Although the majority later suggests that the agreement was "reduced to writing," maj. op. at 1112, it states that "[n]othing about the document suggests the parties thought it a binding agreement." Maj. op. at 1112. In my view, that "agreement" was nothing more than a statement of principles outlining the parties' respective understandings of their properties. So, although this statement was "reduced to writing," it was never an "agreement," let alone a signed, binding one.

divulged under narrow circumstances not relevant here. § 13–22–307(2). But significantly, section 13–22–302(2.5), which defines "mediation communication," expressly provides that "*a final written agreement* reached as a result of a mediation service proceeding ... *which has been fully executed* ... is not a mediation communication unless otherwise agreed upon by the parties." (emphasis added). Thus, section 307 expressly excepts from confidentiality a "final written agreement" that is "fully executed"—i.e., one that is written and signed by the parties under section 308. Not surprisingly, then, both sections 307 and 308 recognize the importance of not binding the parties to anything other than their final written agreement.

Sections 307 and 308 are directed to the same end: to encourage open and candid discussion by the parties in an informal setting. *See* § 13–22–305(1) (directing the office of dispute resolution to establish rules "designed to establish a simple nonadversary format for the resolution of disputes by neutral mediators in an informal setting for the purpose of allowing each participant, on a voluntary basis, to define and articulate the participant's particular problem for the possible resolution of such dispute"). Section 307 promotes this goal by ensuring that mediation communications are not divulged to others. Section 308 promotes this goal by ensuring that those communications are not binding until the parties reduce their agreement to writing and sign on the dotted line. *See, e.g., Reese v. Tingey Constr.*, 177 P.3d 605, 609 (Utah 2008) (noting that "[a] rule permitting courts to enforce only written mediation agreements operates in tandem with the rules providing mediation confidentiality").

Given that analysis of this case under either section 307 or 308 leads to the same result, the question remains why it matters which course the majority takes today. The majority's rationale may not make a difference in the outcome of this case, but it will have a serious negative impact on mediation more generally. By holding that an oral agreement reached in mediation is enforceable even though it does not meet the requirements of section 308, the majority

needlessly chills the candid and informal character of mediation discussion and reduces the efficacy of mediation as a dispute resolution tool—all in contradiction to the Act. For these reasons, I respectfully concur only in the result that the majority reaches.

I am authorized to state that CHIEF JUSTICE MULLARKEY joins in this concurrence.