23CA1729 Wright v Muth 01-30-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1729
City and County of Denver District Court No. 19CV89
Honorable Jill D. Dorancy, Judge

Lonnie Wright,

Plaintiff-Appellee,

v.

Steven E. Muth and MAS Corp., a Colorado public benefit corporation,

Defendants-Appellants.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE BERNARD*
Tow and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 30, 2025

Allen Vellone Wolf Helfrich & Factor P.C., Patrick D. Vellone, Brenton L. Gragg, Denver, Colorado, for Plaintiff-Appellee

Westerfield & Martin, LLC, Zachary S. Westerfield, Denver, Colorado, for Defendants-Appellants

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Defendants, Steven E. Muth and MAS Corp., which we shall shorten to "MAS," appeal the trial court's judgment awarding plaintiff, Lonnie Wright, treble damages on his claims for breach of contract, civil theft, and piercing the corporate veil. We affirm, and we remand the case to the trial court for a determination of reasonable appellate attorney fees.

## I.    Background

¶ 2    Wright and Muth met when they were coworkers at Melco International, where they worked in the sales department. Over the years, Wright had gained some experience in home remodeling by helping friends and family with remodeling projects. In late 2015, after remodeling part of his home, Wright took pictures of the project that he showed Muth.

¶ 3    Impressed by the pictures, Muth, who had previous experience in residential construction, approached Wright, proposing that they work together to buy, fix, and flip houses. After a short conversation, Wright, Muth, and Muth's adult son Zachary entered into an oral agreement to act on Muth's proposal. They would split the profits into three equal shares.

¶ 4 Under the oral agreement, Muth and Zachary would provide the finances to purchase the properties, and Muth and Wright would provide the bulk of the labor to renovate the houses. Muth and Zachary subsequently formed MAS as a public benefit corporation that was created "[f]or profits and house flipping." Wright was not involved in MAS; he was not a part-owner, and he did not have access to, or control over, MAS's activities or finances.

¶ 5 Over the next year and a half, MAS purchased four houses to fix and flip: a house on Holly Street in Commerce City in April 2016; a house on Olive Street in Commerce City in June 2016; a house on Kingsley Avenue in Littleton in August 2016; and a house on Willow Street in Denver in March 2017. MAS eventually sold the Holly Street house in December 2016, the Kingsley Avenue house in April 2017, the Olive Street House in May 2017, and the Willow Street House in March 2018.

¶ 6 Wright worked on the Holly Street House, the Olive Street House, and the Kingsley Avenue house on Friday evenings and on weekends because he was still working full-time at Melco International. Although he asked for his share, Wright did not receive any portion of the profits from the sale of the Holly Street

House in December 2016. As a result, he did less work on the Willow Street house after MAS bought it in March 2017.

¶ 7    Neither Muth nor MAS paid Wright anything after the sales of the other three houses. After each sale, Wright asked Muth when Wright would receive his share of the profits. Each time, Muth replied that he could not pay Wright any money until he did the "accounting" to determine if the sale had been profitable. Finally, in June 2017, shortly after work had begun on the Willow Street House, Wright refused to continue working on the houses until Muth completed the accounting.

¶ 8    For a while, Muth kept promising Wright that he would be paid for his work. Muth hired a bookkeeper in 2018 to do the accounting, but this task was not completed, and Muth eventually quit responding to Wright's requests for payment.

¶ 9    Wright filed this lawsuit against Muth in November 2018, and he later amended the complaint to include claims against both MAS and Zachary. (Zachary later died, so the issues in this appeal only involve Muth and MAS.) As is relevant to our analysis, the complaint alleged claims of breach of contract, civil theft, and

piercing the corporate veil.  Muth and MAS filed some counterclaims.

¶ 10     In February 2022, Muth filed a petition under Chapter 13 of the Bankruptcy Code, and the trial court postponed the trial.  The bankruptcy court eventually dismissed the petition, and the trial court held a bench trial in February 2023.

¶ 11     After the court heard the evidence, it issued a detailed and comprehensive written order.  The court found in Wright's favor on the claims of breach of contract, civil theft, and piercing the corporate veil; it found in Wright's favor on the counterclaims that Muth and MAS had filed; it entered judgment for Wright for $48,729.86 as damages for the profits that Muth and MAS should have paid him; relying on the civil theft statute, it ruled that Wright was entitled to treble damages totaling $146,189.58; it added in prejudgment interest of $23,491.95, bringing the total judgment to $169,681.53; and it ruled that postjudgment interest would accrue at eight percent per annum.

## II.     Breach of Contract Claim

¶ 12     Muth and MAS contend that the trial court erred when it decided that they had breached their contract with Wright.

Specifically, they assert that the trial court erred when it determined that Wright and Muth entered into a partnership. We disagree.

## A. Applicable Law

¶ 13    Generally, contract interpretation is a question of law that we review de novo. *Gagne v. Gagne*, 2014 COA 127, ¶ 50. But whether a contract exists is a question of fact to be determined considering all the surrounding circumstances. *Yaekle v. Andrews*, 195 P.3d 1101, 1111 (Colo. 2008). "The existence of an oral contract, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact." *Beach v. Beach*, 56 P.3d 1125, 1127 (Colo. App. 2002) (citing *Huddleston v. Union Rural Elec. Ass'n*, 841 P.2d 282, 291-92 n.12 (Colo. 1992)), *rev'd on other grounds*, 74 P.3d 1 (Colo. 2003).

¶ 14    "A partnership is an association of two or more persons to carry on, as co-owners, a business for profit . . . ." § 7-60-106(1), C.R.S. 2024. Partnerships are a form of "contract, express or implied, between two or more competent persons to place their money, effects, labor or skill, or some or all of them, into a business, and to divide the profits and bear the losses in certain

5

proportions." *Grau v. Mitchell*, 397 P.2d 488, 489 (Colo. 1964).
"[N]o express agreement is necessary; rather, a partnership may be
formed by the conduct of the parties." *Yoder v. Hooper*, 695 P.2d
1182, 1187 (Colo. App. 1984), *aff'd*, 737 P.2d 852 (Colo. 1987).

¶ 15     To prevail on a breach of contract claim, a plaintiff must show,
by a preponderance of the evidence, "(1) the existence of a contract,
(2) the plaintiff's performance of the contract or justification for
nonperformance, (3) the defendant's failure to perform the contract,
and (4) the plaintiff's damages as a result of the defendant's failure
to perform the contract." *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 46.

## B.     Additional Facts

¶ 16     During the trial, Wright and Muth did not dispute various
aspects of their oral agreement.  They agreed that they would fix up
residential properties and split the anticipated profits into equal
thirds with Zachary when they flipped the properties by selling
them.  They agreed that Muth and Zachary would supply the
project's financing and that Wright and Muth would provide most of
the labor.  They agreed that Zachary would provide some labor, but
they expected him to contribute less because he was a student.

¶ 17    Wright and Muth disagreed about other aspects of the agreement, and they disagreed about who had breached it.

### 1.    Wright's Testimony

¶ 18    For his part, Wright testified that the agreement was to fix and flip houses and that it was not limited to any one house because, when they made the agreement, they had not selected a specific house to fix up.  Wright said that he had agreed to make his tools and his truck available, but he never told Muth that he had all the tools necessary to renovate a house.  And, while Wright said that they had agreed to work on Fridays, Saturdays, and Sundays, they had not agreed to put in a specific number of hours.

¶ 19    Wright acknowledged that he did not provide any finances for fixing the houses and that he did not have final decision-making authority on what properties to buy.  He added that he had not discussed with Muth and Zachary what would happen if they lost money on the houses, but he did not believe that he would be financially responsible for any potential losses.  Nonetheless, Muth would email him information about various houses and ask his opinion about fixing them before MAS bought them.

¶ 20    Wright estimated that he would work for about five to six hours on Fridays, ten to twelve hours on Saturdays, and nine to ten hours on Sundays. He maintained this schedule consistently for fourteen months, and he only missed working on the houses on two or three weekends. Because MAS owned more than one house at a time, they were forced to split their time between houses, which slowed down their progress.

¶ 21    Wright said that Muth did not tell him how much the houses sold for or how much of the sales price was profit. Despite working on each property, Wright had not been paid any portion of the profits by the time that they began working on the Willow Street house. He said that he demanded payment from Muth "countless times."

## 2.    Muth's Testimony

¶ 22    Muth's account of the agreement differed. He claimed that the agreement applied only to the purchase and renovation of the Holly Street house. Concerning the division of labor, Muth said that he and Wright had agreed to provide an equal number of hours for the project. Muth said that Wright agreed to supply all the tools for the project, as well as access to his truck and trailer. Muth added

Wright had said that he would bring his "extensive experience" to the project. Muth asserted that he and Wright had agreed to a three-month plan for fixing up the Holly Street house.

¶ 23    Discussing MAS, Muth said that he had formed it in 2015 as a "public benefit corporation," with the stated purpose of "profits and house flipping." Wright was not a co-owner or a member of MAS. As part of the fix and flip process, MAS both purchased and sold the properties that Muth and Wright worked on.

¶ 24    Muth said that Wright breached their agreement "almost immediately" after work began on the Holly Street house. In support of his assertion, Muth claimed that Wright

- did not bring his tools to the house;

- stopped working at the house for weeks after he was potentially exposed to asbestos;

- refused to do any work on Mondays through Thursdays;

- did not provide Muth with access to his truck or trailer; and

- misrepresented the level of his expertise in renovating houses.

¶ 25    Muth testified that these alleged breaches caused significant delays and financial hardship to the house renovation project.  He said that he was forced to hire subcontractors to make up for the hours of work that Wright missed.  Muth added that he had to buy tools for the project, and eventually even buy a truck, because Wright was not providing these items, even though he had agreed to do so.  And while Muth agreed that Wright had provided labor on the Olive Street, Kingsley Avenue, and Willow Street houses, he said that Wright had not performed this labor as part of his agreement with Muth.  Rather, Muth stated that Wright had worked on these houses to make up for the time he did not work on the Holly Street house.

### 3.    The Trial Court's Written Order

¶ 26    The court found that Wright and Muth had entered into an enforceable agreement to form a partnership for the purpose of fixing and flipping houses and that Muth had breached it.  The court found that Wright's testimony was credible on matters such as his work on the houses, the tools that he had agreed to provide, and his level of expertise.

¶ 27    But the court rejected much of Muth's testimony.  It found that his account of events lacked credibility.  For instance, the court noted that, although Wright had testified in detail about the work he performed on the houses, Muth's recollection was "generally about activities such as picking up and organizing materials, arranging for subcontractors, moving trees, and helping with drywall."

¶ 28    The court also found other parts of Muth's testimony implausible.  It rejected his assertions that he would spend about fifty-five hours a week working on the houses while he maintained full time employment at Melco International, and it found that his testimony that Wright had breached the contract was incredible.

¶ 29    The court found that Wright and Muth had "entered into an enforceable contract, a partnership agreement."  In that regard,

- Muth and Wright agreed to "renovate and sell houses that . . . Muth would buy, and the profits would be split in equal thirds";

- "Wright agreed to contribute his time, labor, expertise, and the tools and equipment he had to the venture";

11

- "Muth agreed to finance the homes and contribute his time and labor"; and

- "[t]he partnership did not require equal labor contribution from each of the partners when the agreement was made."

¶ 30    In summary, the court found that Wright and Muth had agreed to the essential terms of the partnership agreement: "each of the men knew what [he] would contribute — labor or expertise or tools or financing — and each man knew what [he] would receive — a definite share of the profits if the venture were profitable."

## C.    Analysis

### 1.    Standard of Review

¶ 31    Muth and MAS submit that, because this appeal concerns the interpretation of the oral agreement, we must review this contention de novo. *See Gagne*, ¶ 50. But the core of their contention is more fundamental than a disagreement over what the terms of the agreement meant: they assert that there was no agreement at all. In service of this assertion, they submit that (1) the court "erred in finding that the parties entered into a partnership agreement to fix-and-flip properties"; and (2) even if Wright's description of the

12

agreement is the "correct version," there were "a multitude of reasons" why a "legally enforceable oral contract [did] not exist."

¶ 32   As we have indicated above, the question of whether an oral contract was created is a question of fact. *See Yaekle*, 195 P.3d at 1111; *Beach*, 56 P.3d at 1127. So we will review the court's finding that there was "an enforceable contract, a partnership agreement" by evaluating all the surrounding circumstances, *see Yaekle*, 195 P.3d at 1111, and we will uphold the court's factual findings if there is evidence in the record that supports them, *see Loveland Essential Grp., LLC v. Grommon Farms, Inc.*, 251 P.3d 1109, 1117 (Colo. App. 2010); *Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006). In other words, we will not disturb the court's findings on these matters unless they are so clearly erroneous as to find no support in the record. *See Adler v. Adler*, 445 P.2d 906, 908 (Colo. 1968). It is not for us to reweigh the evidence or to substitute our own judgment for the trial court's. *In re Estate of Owens*, 2017 COA 53, ¶ 22.

¶ 33   To the extent that Muth and MAS contend that the evidence was insufficient to prove that there was a partnership or an oral agreement, we must decide whether the evidence, when viewed as a

13

whole and in the light most favorable to Wright as the prevailing party, was sufficient to support the court's judgment. *See Fisher v. State Farm Mut. Auto. Ins. Co.*, 2015 COA 57, ¶ 40, *aff'd*, 2018 CO 39. It was within the court's "sole province" to assess the credibility of the witnesses, the probative effect and the weight of the evidence, and the inferences to be drawn from the evidence. *See id.*

### 2. Formation of the Partnership

¶ 34 Under section 7-64-202(1), C.R.S. 2024, "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." We conclude, for the following reasons, that there is evidence in the record supporting the trial court's finding that Wright and Muth entered into a partnership to renovate and to sell houses.

¶ 35 Although they disagreed about the details, Wright and Muth testified at trial that they had entered into an agreement that they would fix and flip houses, splitting the profits into equal thirds. To that end, Wright testified that he believed that they were partners because, in part, (1) Muth often referred to the two of them as "we" when discussing the work on the houses; (2) they had agreed to use

their skills and their efforts together to fix and flip houses; and (3) Muth would send him emails asking for his input on which houses to buy.

¶ 36     Muth and MAS raise several objections to the trial court's findings.  They contend that there was not a partnership because Wright was not a co-owner of MAS, he did not control it, and he did not share in the partnership's potential losses.  We disagree.

¶ 37     First, the fact that Wright did not have an ownership interest or any ability to control MAS is a red herring.  Wright conceded at trial that he was not a co-owner or member of MAS and that he was not involved in its operation.

¶ 38     The court found that Wright and Muth's partnership was *separate* from MAS.  While Muth had formed MAS to assist in fixing and flipping houses, the court observed that there was no evidence that MAS was a part of Wright and Muth's partnership.  Rather, their partnership was based on their agreement to renovate houses and split the profits when they sold the houses.

¶ 39     Second, Muth and MAS submit that, because Wright said he was not responsible for any losses, he and Muth were not partners;

15

Wright was, instead, an independent contractor. We are not persuaded.

¶ 40     Section 7-60-118, C.R.S. 2024, sets out the rights and duties of partners. Subsection (1)(a) states that "[e]ach partner shall . . . contribute toward the losses whether of capital or otherwise sustained by the partnership according to such partner's share in the profits." "In the absence of language to the contrary, the law presumes that losses are to be borne by the partners in the same percentage as profits." *Tucker v. Ellbogen*, 793 P.2d 592, 596 (Colo. App. 1989). "[S]imply because losses are not specifically mentioned does not mean there has been no agreement establishing a joint venture." *McNeill v. Allen*, 534 P.2d 813, 817 (Colo. App. 1975).

> While the sharing of losses is an incident of partnership, it has been held that the right to participate in profits implies a corresponding liability for losses, and that though there is no clause in the contract saying that either party was to bear the losses, in the absence of evidence to the contrary, the law presumes that losses were to be borne by them in the same proportion in which they shared the profits.

*Quier v. Rickly*, 177 P.2d 549, 552 (Colo. 1947)(citation omitted).

16

¶ 41 The fact that Wright did not think that he was responsible for any losses generated by the partnership does not mean that he was right: we have seen that the sharing of losses is a requirement of a partnership. *See* § 7-60-118. So, because the court found that there was a partnership — and *not* that Wright was an independent contractor — the law presumes that Wright had a duty to bear a portion of the partnership's putative losses: in for a penny, in for a pound. *See Quier*, 177 P.2d at 552.

¶ 42 Muth and MAS submit that there was no partnership because Wright did not direct all the partnership's activities, such as buying and selling the houses. But, although "[a]ll partners have equal rights in the management and conduct of the partnership business," § 7-60-118(1)(e), a partner may agree to delegate the management responsibilities to another. *See Tucker*, 793 P.2d at 597 ("[P]artners may agree that one or more of them shall have exclusive control over the management of the partnership business."); *Chan v. HEI Res., Inc.*, 2022 CO 36, ¶ 21 (recognizing that partners retain control over their business venture even where they delegate the day-to-day management responsibilities to others).

¶ 43    Once the court found that Wright and Muth were in a partnership, it had found that there was a contract between them. *See Grau*, 397 P.2d at 489.  Because we conclude that the evidence supports the court's findings, we need not further address Muth and MAS's contentions that (1) there was no enforceable oral contract because there was "insufficient certainty regarding the material terms of" Wright's description of the contract "to be legally enforceable"; and (2) Wright's "version of the contract also fails because there was no meeting of the minds, [and] it lacked consideration."

### 3.    Proof of Profits, Breach of the Partnership Agreement, and the Implied Duty of Good Faith and Fair Dealing

#### a.    Proof of Profits

¶ 44    Muth and MAS contend that they did not breach the partnership agreement because Wright did not show that the sales of any of the four houses yielded a profit.  We disagree.

¶ 45    Two experts, one called by Wright, and one called by Muth and MAS, testified about whether the sales of the houses returned any profits.  In finding that the sales had produced profits, the court adopted testimony from Wright's expert.  Although Muth and MAS

18

submit that Wright's expert made mistakes in calculating expenses, such as not including loans that Muth had arranged or not considering some reports, the court found that Wright's expert was more credible than Muth and MAS's expert.

¶ 46    On the one hand, the court favored the testimony of Wright's expert because she

- was a certified public accountant;

- had used generally accepted standard accounting principles when analyzing the evidence in this case;

- had experience in "construction accounting"; and

- had reviewed information from a variety of sources, including MAS's corporate records.

¶ 47    On the other hand, the court was less impressed with the testimony of Muth and MAS's expert because

- she was only beginning to learn construction accounting when she analyzed the records in this case;

- she admitted to making some mistakes in her calculations in this case; and

- she looked at whether MAS was a profitable entity as opposed to whether the sales of the four houses had generated any profits.

¶ 48 We conclude that the decision of which expert to believe was within the court's discretion and that there was evidence in the record to support the court's decision that the testimony of Wright's expert that the sales of the four houses had yielded profits was more credible. *See Fisher*, ¶ 40.

### b. Breach of the Partnership Agreement

¶ 49 Muth and MAS assert that it was Wright who breached the partnership agreement by not providing fifty percent of the labor and by not giving Muth access to Wright's tools, truck, and trailer. Again, this was an issue of fact, and there is evidence in the record supporting the court's decision to reject these assertions. *See Adler*, 445 P.2d at 908.

¶ 50 For example, Wright testified that he worked on the houses on nearly every Friday, Saturday, and Sunday, for the duration of the project. He described in detail the work that he did on each of the houses. He said that he provided Muth with consistent access to his truck and trailer, and he identified numerous occasions when

he picked up materials and transported them to the houses. He provided Muth with access to the tools he had, and he stated he never told Muth that he had all the tools necessary to renovate a house.

¶ 51    The court found that his testimony was credible, and, because it is supported by evidence in the record, we have no basis to reach a different conclusion. *See In re Estate of Owens*, ¶ 22; *Fisher*, ¶ 40.

c.    Implied Duty of Good Faith and Fair Dealing

¶ 52    Muth and MAS assert that Wright breached the partnership agreement because he violated the contract's implied duty of good faith and fair dealing. We disagree.

¶ 53    "Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994). To that end, "[e]very contract in Colorado contains an implied duty of good faith and fair dealing." *New Design Constr. Co. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo. App. 2008) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)). A violation of this duty gives rise to a

claim for breach of contract. *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006). The duty applies "when the manner of performance under a specific contract term allows for discretion on the part of either party." *New Design Constr. Co.*, 215 P.3d at 1181 (quoting *Parker*, 138 P.3d at 292). At its core, the duty "requires only that the parties perform in good faith the obligations imposed by their agreement." *Wells Fargo Realty Advisors Funding, Inc.*, 872 P.2d at 1363. "Whether a party acted in good faith is a question of fact to be determined on a case-by-case basis." *Univ. of Denver*, ¶ 51.

¶ 54 Muth and MAS contend that Wright testified that he had discretion (1) "regarding how many hours he had to work fixing and flipping the properties"; and (2) "regarding the percentage of the total of work he was to contribute." According to Muth and MAS, this testimony allowed Wright "to control the terms of performance and allow[ed] him to be the sole judge to determine if his performance met his contractual obligations." So, Muth and MAS finish up, Wright breached the duty of good faith and fair dealing because he acted "contrary" to the partnership's "agreed common purpose and the parties' reasonable expectations."

¶ 55 The court found that, "although [Muth] claimed that the parties agreed to match hours, . . . matching hours exactly was not a term of the agreement, especially when viewed from the perspective of the parties when they entered into the agreement." The court decided that, "[i]n the absence of a specific term [in the partnership] concerning the hours each man was to contribute to the venture," "each man agreed to dedicate a reasonable amount of time." The court then found that Wright had "performed his side of the agreement by dedicating most of his Friday nights, Saturdays, and Sundays to working on the houses." As a result, the trial court's factual findings undercut Muth and MAS's contention that Wright violated the implied duty of good faith and fair dealing. *See id.*

### III. Civil Theft

¶ 56 Muth and MAS contend that the trial court erred in finding that they had committed civil theft because (1) a creditor/debtor relationship existed between Wright and Muth; and (2) Wright cannot establish that Muth and MAS knowingly retained or exercised control over a thing of value. We disagree.

23

¶ 57    To succeed on a claim for civil theft, a plaintiff must establish

that the defendant knowingly obtained, retained, or exercised

control over anything of value without authorization or by threat or

deception and that the defendant acted intentionally or knowingly

in ways that deprived the plaintiff permanently of the thing of value.

*See Scott v. Scott,* 2018 COA 25, ¶ 26; § 18-4-401, C.R.S. 2024.

Like criminal theft, civil theft also requires that the defendant have

the specific intent to permanently deprive the owner of the benefit of

the property. *Van Rees v. Unleaded Software, Inc.,* 2016 CO 51,

¶ 21.

## A.    Additional Facts

¶ 58    The court found that Muth and MAS had committed civil theft

by knowingly retaining Wright's portion of the profits with the intent

to deprive him permanently of that property. As we have concluded

above, the court found that one part of the partnership agreement

was that Wright was entitled to one-third of the profits from the sale

of each house.

¶ 59    The court added that

> the parties had an enforceable contract
> whereby [Wright] was entitled to one-third of
> the profits from the houses the parties fixed

24

and flipped together.  Renovating the houses produced a profit.  When the houses were sold, [Muth and MAS] received those profits.  Once [Muth and MAS] received the profits from the houses [Wright] had an interest in one-third of those profits.  [Muth and MAS] did not give . . . Wright his share of the profits, but instead either retained or used them. . . . Wright did not consent to this or authorize it, instead demanding, repeatedly, that the profits be given to him.

## B.    Analysis

¶ 60    Muth and MAS correctly assert that the existence of a creditor/debtor relationship by itself is insufficient to give rise to a claim of civil theft.  *See Tisch v. Tisch*, 2019 COA 41, ¶ 53.  But if a plaintiff obtains "a distinct, proprietary interest" in specific property, a claim of civil theft may then be brought.  *Id.* at ¶ 63.

¶ 61    Muth and MAS submit that a contract dispute in which one party performs services, and the other party fails to pay, is only sufficient to create a creditor/debtor relationship.  Because, they continue, the "property" at issue is "indirect economic lost 'profits,'" Wright cannot establish the elements of civil theft.  And, they finish up, a right to recover "a debt, or money, or damages for a breach of contract" cannot create a claim for civil theft.  *See City & Cnty. of*

25

*Denver v. Jones*, 274 P. 924, 924-25 (Colo. 1929) (quoting 1 Bouvier's Law Dictionary 483 (3d rev. 1914)).

¶ 62    But Wright's interest in property — one-third of the profits from selling the houses — was not speculative or theoretical. Rather, under the partnership agreement, he accrued an interest once each house sold, which was sufficient to sustain a claim for civil theft.  *See Tisch*, ¶¶ 55-59 (noting that the corporate distribution of dividends was specific money in which the shareholders maintained an interest).

¶ 63    Muth and MAS also submit that Wright did not establish that they had "knowingly exercised control" over Wright's property, or that Muth and MAS had acted intentionally to retain all the profits from each sale.  We disagree.

¶ 64    The court found that Muth and MAS had knowingly and intentionally retained the profits from each house with the "intent that Mr. Wright would never receive them."  We conclude, for the following reasons, that this finding is supported by the record.  *See In re Estate of Owens*, ¶ 22; *Fisher*, ¶ 40.

¶ 65    Wright's expert, whom the court found credible, testified that the sale of each of the houses resulted in a specified amount of

profit. To reach that figure, she reviewed MAS's financial statements, books, and records; she considered various third-party sources, such as credit cards and bank statements; and she looked at other documentary evidence. She then calculated that Wright was entitled to a specified share of those profits.

¶ 66 Muth's conduct before and after selling the Holly Street house supports the court's finding that there were profits. Although Muth told Wright that he had not spent any of the proceeds of selling the Holly Street house, he had done so. For example, before the sale of the Holly Street house, the expert testified that MAS's expenses appeared to be business expenses, such as materials and payments to subcontractors.

¶ 67 But, following the sale of the Holly Street house, MAS's purchases changed drastically. Muth bought a Ford Mustang for over $24,000 a day after the sale. Over the next year, MAS's bank account was used to make frequent and consistent purchases at fast food restaurants, liquor stores, grocery and pet stores, and dating websites.

¶ 68 The record also contains evidence showing that Muth acted knowingly or intentionally. Wright's expert said that Muth had

27

transferred $55,000 from MAS's account to an E-trade account, which he used to trade stock. Wright repeatedly demanded payment from Muth, but Muth repeatedly refused, claiming that he either needed to do an "accounting" or that he needed to liquidate assets to pay Wright. On one occasion, Muth told Wright that he would pay him once he sold one of the properties, but Muth had already sold the same property weeks earlier. *See Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009)("The intent permanently to deprive the owner of the use or benefit of a thing of value may be inferred from the defendant's conduct and the circumstances of the case, but requires proof of a knowing use by the defendant inconsistent with the owner's permanent use and benefit.").

IV.    Piercing the Corporate Veil

¶ 69    Muth and MAS contend that the court erred in piercing the corporate veil, determining that Muth and MAS were alter egos of each other. They submit that (1) MAS was not Muth's alter ego; (2) Muth did not use MAS to defraud Wright or to defeat his rightful claim; and (3) piercing the corporate veil led to an inequitable result. We disagree.

28

## A. Standard of Review

¶ 70 "To prevent abuse, Colorado law permits trial courts to disregard the corporate form and pierce the corporate veil when a corporation and a shareholder are alter egos of each other." *In re Phillips,* 139 P.3d 639, 644 (Colo. 2006). Piercing the corporate veil involves a mixed question of law and fact. *Lester v. Career Bldg. Acad.,* 2014 COA 88, ¶ 42. We therefore defer to the trial court's findings of fact if they are supported by the record, but we review the trial court's legal conclusions de novo. *Million v. Grasse,* 2024 COA 22, ¶ 22. The issue of whether a court should pierce the corporate veil based on the facts in the record is one such legal conclusion. *Id.*

¶ 71 To pierce the corporate veil, a court must conduct a three-part inquiry. *Sedgwick Props. Dev. Corp. v. Hinds,* 2019 COA 102, ¶ 21. First, it must determine whether the corporate entity is the alter ego of the person or entity in issue. *Id.* An alter ego relationship exists when a corporation or limited liability company is merely an instrumentality for the transaction of the shareholders' or members' affairs and "there is such unity of interests in ownership that the separate personalities of the corporation and the owners no longer

exist." *In re Phillips*, 139 P.3d at 644 (quoting *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 867 n.7 (Colo. 2004)).

¶ 72    Second, a court must determine whether the corporate fiction was used to perpetuate a fraud or defeat a rightful claim. *Sedgwick*, ¶ 21.

¶ 73    Finally, a court must consider whether disregarding the corporate form would achieve an equitable result. *Id.*

¶ 74    If the court finds that the moving party has satisfied the three-part test by a preponderance of the evidence, then it may disregard the corporate form and impute liability to the relevant individual or individuals. *Id.*

### B.    Analysis

¶ 75    We conclude, for the following reasons, that the record supports the court's findings and its legal conclusions. *See Million*, ¶ 22; *Lester*, ¶ 42.

¶ 76    To show that an alter ego relationship exists, a court should consider whether

> (1) the corporation is operated as a distinct business entity; (2) funds and assets are commingled; (3) adequate corporate records are maintained; (4) the nature and form of the entity's ownership and control facilitate

30

> misuse by an insider; (5) the business is thinly capitalized; (6) the corporation is used as a "mere shell"; (7) legal formalities are disregarded; and (8) corporate funds or assets are used for noncorporate purposes.

*McCallum Fam. L.L.C. v. Winger*, 221 P.3d 69, 74 (Colo. App. 2009).

¶ 77 First, Wright provided a substantial amount of evidence showing that Muth used MAS as his alter ego. Notably, MAS's financial transactions following the sale of the Holly Street house showed that Muth used MAS as his personal bank account. MAS's transactions following this sale became increasingly "personal" in nature, with the corporation buying a car, liquor, groceries, pet supplies, and subscriptions to dating websites.

¶ 78 Wright's expert testified that, based on her analysis of MAS's finances, it appeared that the Muth's and MAS's funds were often comingled, with MAS routinely paying Muth's personal expenses.

¶ 79 Muth's consistent use of MAS's funds for his personal expenses led to a severe undercapitalization of MAS. On several occasions, MAS ran out of money in its corporate bank accounts, leading to thousands of dollars in overdraft fees.

¶ 80 The record contains evidence that MAS did not comply with customary corporate formalities. Wright's expert testified that the

corporation's general ledger was in disarray. Muth's expert conceded that MAS's "profit and loss statements" contained inaccuracies.

¶ 81    Second, Muth used MAS to conceal the partnership's business from Wright. Because Wright had no control in, or ownership of, MAS, he was denied important information about the partnership's business, including whether the house sales made a profit. As a result, Muth was able to use the profits from the sales of the houses without Wright's knowledge.

¶ 82    Third, the record shows that Muth used MAS to defeat Wright's rightful claim to the partnership's profits. During the partnership, Muth personally used some of the profits; after the partnership ended, he used the money to invest in new properties. By doing so, Muth placed Wright's share of the profits beyond Wright's grasp. So the court decided to pierce the corporate veil to achieve an equitable result.

¶ 83    Muth and MAS submit that the testimony of their expert showed that there were no profits. But, as we have concluded above, this was a factual question that the court resolved with support in the record.

## V.    Damages

¶ 84    Muth and MAS assert that the record did not support the court's computation of Wright's damages.  They submit that Wright's expert did not provide a specific breakdown of the profits earned from each house; instead she only provided a report containing an estimate of the profits derived from the sales of the four houses.  They add that Wright conceded that he was not owed one-third of the profits from the sale of the Willow Street house.  We disagree.

¶ 85    Generally, a trial court has broad discretion in determining the amount of damages, and its decision will not be disturbed on appeal absent an abuse of discretion.  *McDonald's Corp. v. Brentwood Ctr., Ltd.*, 942 P.2d 1308, 1311 (Colo. App. 1997).  The trial court's award of damages will not be set aside unless it is manifestly and clearly erroneous.  *Roberts v. Adams*, 47 P.3d 690, 697 (Colo. App. 2001).

¶ 86    First, we note that Muth and MAS's characterization of Wright's concession is misleading.  Although Wright testified that he had stopped working on the Willow Street house before the work was complete, he did so only after Muth had refused to pay him any

of the partnership's profits for over a year. And while Wright indicated that he might not be entitled to a one-third split of the profits from the Willow Street house, he never said that he was not owed anything for his work on that house. Indeed, during cross-examination, Wright repeatedly said that he was owed compensation for his work on the Willow Street house.

¶ 87 Second, the record contains evidence to support the court's findings of damages. For example, the court found the testimony of Wright's expert credible, it decided that the sale of the houses had yielded profits based on that testimony, and its damages award arose from that testimony. *See id.*

## VI. Appellate Attorney Fees

¶ 88 Wright asks us to award him attorney fees "for defending an appeal concerning a civil theft claim." The civil theft section, section 18-4-405, C.R.S. 2024, states that the owner of the property "may also recover . . . reasonable attorney fees."

¶ 89 We agree that Wright is entitled to reasonable appellate attorney fees under the civil theft statute. Relying on C.A.R. 39.1, and because the trial court is better suited to conduct any necessary factual inquiry, we exercise our discretion and remand to

the trial court to determine and to award Wright reasonable appellate attorney fees. *See Black v. Black*, 2018 COA 7, ¶ 130.

¶ 90 The judgment is affirmed, and the case is remanded to the trial court for a determination of reasonable appellate attorney fees.

JUDGE TOW and JUSTICE MARTINEZ concur.